**BELCON INCORPORATED,**
Petitioner,

v.

**DISTRICT OF COLUMBIA WATER AND SEWER AUTHORITY,**
Respondent.

No. 01–AA–214.

District of Columbia Court of Appeals.

Argued Jan. 9, 2003.
Decided June 12, 2003.

382

Joanne D. Donohue, Hamilton, VA, for petitioner.

Edward E. Schwab, Assistant Corporation Counsel, with whom Robert R. Rigsby, Corporation Counsel at the time the brief was filed, and Charles L. Reischel, Deputy Corporation Counsel, were on the brief, for respondent.

Before TERRY, SCHWELB, and GLICKMAN, Associate Judges.

SCHWELB, Associate Judge:

The wheels of justice sometimes grind very slowly indeed, and this case, somewhat like the interminable Chancery suit known as *Jarndyce v. Jarndyce*,[1] appears almost to have achieved a state of perpetuity, with no end as yet in sight. In 1983 Belcon Incorporated entered into a contract with the District of Columbia Department of Public Works Water and Sewer Utility Administration (WASUA)[2] in which Belcon agreed to provide landscaping for a waste water treatment plant. Belcon completed the project in 1985, but disagreements over payment linger. Seven years after three Administrative Judges of the District of Columbia Contract Appeals Board heard the dispute between Belcon and the District, three new and different Administrative Judges sustained some of Belcon's claims, denied others, and awarded the company $370,741.48, together with interest on that amount. Belcon has asked this court to review the Board's decision, and it seeks an award of an additional $166,311.86, together with a substantial sum of accumulated interest. Concluding that the Board erred in its disposition of several of Belcon's claims, we vacate the Board's decision and reluctantly (in light of the age of the case) remand for further proceedings consistent with this opinion. Foreshadowing the major ruling that follows, we direct that on remand, the Board must not reject uncontradicted evidence submitted by any party without explaining on the record, and in reasonable detail, why it has done so.

1. CHARLES DICKENS, BLEAK HOUSE.

2. Belcon's original contract was with the Department of Public Works, a District agency. The responsibility for waste water treatment plants has since been assigned by law to the District of Columbia Water and Sewer Authority (WASA), and WASA—an entity independent of the District, *see Dingwall v. Dis-*

## I.

### BACKGROUND

In September 1983 Belcon entered into a contract with the District for Phase I of the Master Landscaping Plan at the Blue Plains Wastewater Treatment Plant. The contract required Belcon to excavate, backfill, and regrade soil; to construct roads, walks, fences, gates, and other structures; and to seed lawns and plant trees and other greenery. All of the work was to be completed within a year. While the work was being done, however, the District asked Belcon to perform additional projects not initially contemplated by the parties and not included in the contract. Belcon agreed to carry out the requested work and substantially finished the project, including all additional tasks, by the end of June 1985.

That should have been that, but unfortunately for all concerned, the parties became embroiled in a contentious dispute over payment for the additional work and for other items. In 1986 Belcon asked the Department's contracting officer to resolve the contested issues. In 1988 the contracting officer determined that some of Belcon's claims were meritorious, and he held that the company was entitled to be paid an additional sum of $36,612.04.

In 1989 Belcon appealed to the Contract Appeals Board from the contracting officer's decision. In August and September of 1993 an eight-day hearing was held before Administrative Judges Zoe Bush (now a judge of the Superior Court), C.

*trict of Columbia Water & Sewer Auth.*, 766 A.2d 974 (D.C.2001), *adopted*, 800 A.2d 686 (D.C.2002) (per curiam) (en banc)—is now the respondent in the case. For convenience, and notwithstanding WASA's independent status, we refer to the party with which Belcon contracted and dealt as the District.

Hawkins–Leon, and T.H. Lee. By far the greatest part of the hearing was devoted to testimony from Belcon's President, Lester J. Belcher, Jr., and there was little contradiction of that testimony in the relatively brief case (well under two days) presented by the District. On October 23, 2000, after a truly extraordinary delay during which the membership of the Board apparently changed, the Board issued its decision, which was signed by Administrative Judges Phyllis W. Jackson, Lorilyn E. Simkins, and Jonathan D. Zischkau. The Board granted some of Belcon's claims, denied others, and awarded Belcon a total of $370,741.48, with interest at the rate of 4% per annum. The Board held that Belcon was not entitled to recover its counsel fees. Belcon filed a timely petition for review.[3]

## II.

### STANDARD OF REVIEW

 We review decisions of the Contract Appeals Board deferentially. The Board's factual findings "shall be final and conclusive and shall not be set aside unless the decision is fraudulent, arbitrary, capricious, or so grossly erroneous as to necessarily imply bad faith, or if *the decision is not supported by substantial evidence.*" D.C.Code § 2–309.07 (2001) (emphasis added).[4] Evidence is substantial when "a reasonable mind might accept [it] as adequate to support a conclusion." *Epstein, Becker & Green v. District of Columbia Dep't of Employment Servs.*, 812 A.2d 901, 903 (D.C.2002). So long as a finding is

supported by substantial evidence, we must accept it, "even though there may also be substantial evidence in the record to support a contrary finding." *Harrison v. Univ. of District of Columbia,* 758 A.2d 19, 22 (D.C.2000).

 "Our review of the [Board's] legal rulings is *de novo,* for '[i]t is emphatically the province and duty of the judicial department to say what the law is."' *Harris v. District of Columbia Office of Worker's Comp.,* 660 A.2d 404, 407 (D.C. 1995) (quoting *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803)). The Board has expertise in contract appeals, and "legal interpretations by tribunals having expertise are helpful even if not compelling." *District of Columbia v. Org. for Envtl. Growth, Inc.,* 700 A.2d 185, 198 (D.C.1997) (citation omitted). We therefore accord "great weight" to the Board's construction of a government contract, so long as that construction is not unreasonable. *Dano Resource Recovery, Inc. v. District of Columbia,* 620 A.2d 1346, 1352 (D.C.1993). The last word, however, is the court's, for "the judiciary is the final authority on issues of statutory construction," *Harris,* 660 A.2d at 407 (citation omitted), and, obviously, on other legal issues as well.

## III.

### THE DISPUTED CLAIMS

Only five of the sixty claims raised by Belcon before the Board remain at issue. We address each of them in turn.

---

**3.** In light of the age and complexity of the case, the significant possibility that a further remand to the Board would be required, and the consequent potential for substantial additional delay and expense, this court directed the parties, following oral argument, to determine whether a negotiated resolution was possible. The parties were, however, unable to reach agreement.

**4.** In this case, there is no claim of fraud or of arbitrary or capricious findings. The only issues are whether certain of the Board's findings lack support by substantial evidence or whether parts of its decision are legally erroneous.

### A. Proposed Change Order (PCO) No. 1—Borrow Embankment Fill.

Belcon argues that it is entitled to an additional payment of $930.00 under Proposed Change Order No. 1—Borrow Embankment Fill. "Borrow embankment fill" is fill material, in this case earth, that Belcon was obliged to acquire off-site in order to supplement an inadequate supply of fill material available on-site. Although the Board denied this claim, the District does not oppose it, and we treat the point as conceded. *Rose v. United States*, 629 A.2d 526, 536–37 (D.C.1993); *Carducci v. Regan*, 230 U.S.App. D.C. 80, 86, 714 F.2d 171, 177 (1983). In light of the District's concession, we conclude, notwithstanding the Board's ruling, that Belcon is entitled to an additional award of $930.00 with respect to PCO No. 1.

### B. PCO No. 3—Borrow Structural Backfill.

Belcon asserts that the Board's award of only $148.20, pursuant to Proposed Change Order No. 3—Borrow Structural Backfill, is premised on a finding of fact that is not supported by substantial evidence. We are constrained to agree.

Structural backfill is fill material, such as gravel or crushed stone, suitable for use under or against structures. Like the embankment fill at issue in PCO No. 1, the structural backfill that is the subject of PCO No. 3 had to be "borrowed" or acquired off-site. The contract price for this work was $26.00 per cubic yard, and it was estimated that 92 cubic yards would be required. Belcon claimed that it provided to the District an amount of structural backfill far in excess of this estimate, specifically 1227.7 cubic yards. The District disagreed, claiming that it was obliged to pay only for 80 cubic yards. Belcon seeks compensation for an additional 874.2 cubic yards of fill, or $22,729.20.[5]

To support its claim before the Board, Belcon introduced its daily job reports, the superintendent's diary, contract drawings, letters from Belcon to the District, and the testimony of Mr. Belcher. The Board found that Belcon was entitled to payment for an additional 5.7 cubic yards of fill because the daily job report for August 15, 1984, stated that Belcon had provided exactly this amount of material. The Board found that Belcon was not entitled to any additional payment on this claim because, according to the Board, the evidence was insufficient to support a greater award. The Board wrote in its decision that "Belcon's records adequately substantiate only 5.7 cubic yards."

In our view, the foregoing finding is not supported by substantial evidence. In fact, Belcon did introduce substantial unrebutted evidence to support a finding that the company provided more than 5.7 cubic yards of fill material. Specifically, Belcher testified without contradiction that District officials had previously agreed to pay Belcon for an additional 243.2 cubic yards of structural backfill.[6] If credited, this uncontroverted testimony necessarily

---

**5.** In its brief, Belcon argued that it was entitled to payment for 874.6 c.y. of fill ($22,739.60) or, in the alternative, 862.2 c.y. of fill ($22,417.20). The company did not explain the first total and represented the second as the sum of a series of numbers which, when added correctly, came to a total of 781.6 c.y., not 862.2 c.y. Reading Belcon's argument closely, we conclude that the company is actually seeking credit for 874.2 c.y. of fill ($22,729.20): Item 7 = 44 c.y; Item 9 = 3.9 c.y.; Item 10 = 10 c.y.; Item 11 = 26.7 c.y.; Item 12 = 26 c.y.; Item 13 = 10 c.y.; Item 17 = 30 c.y.; Item 21 = 618 c.y.; Item 22 = 92.6 c.y.; and Item 23 = 13 c.y.

**6.** Belcher testified that the District agreed to pay for the provision of 44 c.y. under Item 7, 3.9 c.y. under Item 9, 10 c.y. under Item 10, 26.7 c.y. under Item 11, 26 c.y. under Item 12, 10 c.y. under Item 13, 30 c.y. under Item 17, and 92.6 c.y under Item 22. According to

invalidated the Board's finding, which was premised, as we have noted, on a perceived lack of supporting evidence.

■ The Board did not explicitly disbelieve Belcher's unchallenged and apparently probative testimony as to PCO No. 3.[7] Indeed, this part of his testimony is not mentioned at all in the Board's decision. We have stated that "[a]n agency, as a finder of fact, may credit the evidence upon which it relies to the detriment of conflicting evidence, and [generally] need not explain why it favored the evidence on one side over that on the other." *McKinley v. District of Columbia Dep't of Employment Servs.*, 696 A.2d 1377, 1386 (D.C. 1997) (citation omitted). In this case, however, there was no conflicting evidence. Quite simply, one scale pan was empty while the other was not.[8]

■ There is "a [rebuttable] presumption that each witness, including the parties, has sworn to the truth." *Ross v. Fierro*, 659 A.2d 234, 239 n. 5 (D.C.1995) (quoting *Brown v. United States*, 590 A.2d

1008, 1021 n. 19 (D.C.1991)). "[A] witness is presumed to speak the truth, but the presumption may be outweighed by the manner in which the witness testified, by [the] character of the testimony given, or by contradictory evidence." 1 JOSEPH M. McLAUGHLIN, JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 107.22[4] (2d ed.2003).

■ The foregoing rebuttable presumption applies with greater force when the witness' testimony is uncontradicted. "Ordinarily, positive testimony which is not inherently improbable, inconsistent, contradicted, or discredited cannot be disregarded or ignored by judge or jury," *Perlman v. Chal–Bro, Inc.*, 43 A.2d 755, 756 (D.C.1945) (citing *Stone v. Stone*, 78 U.S.App. D.C. 5, 8, 136 F.2d 761, 764 (1943)), or, for that matter, by any trier of fact.[9] *See* 32A. C.J.S. EVIDENCE § 1329 (1996).

■ The presumption that uncontradicted testimony is to be credited can, of

---

Belcon, Belcher testified further that the District agreed to pay for an additional 13 c.y. under Item 23; we have found no evidence of this testimony in the record.

7. Because none of the members of the Board who decided the case was present when Belcher testified, any decision not to believe Belcher's testimony could not have been based on an assessment of his demeanor.

8. We do not agree, however, that the Board's rejection of Belcon's claim for 618 c.y. in relation to Item 21 lacks the requisite evidentiary support. Belcher testified that Matt Vanderzon and Hans Neukirk, two District engineers, agreed to pay for 618 c.y. of borrow structural backfill. Neukirk, however, testified that he made no agreements with Belcon regarding borrow structural backfill. The two accounts are mutually exclusive, and only one can be credited. Because an impartial trier of fact might reasonably accept Neukirk's recollection over Belcher's, this finding of fact is supported by substantial evidence.

9. In *Chesapeake & Ohio Ry. Co. v. Martin*, 283 U.S. 209, 216, 51 S.Ct. 453, 75 L.Ed. 983 (1931), the Court elaborated on the principles governing uncontradicted testimony and applied them to the record before it:

We recognize the general rule, of course, as stated by both courts below, that the question of the credibility of witnesses is one for the jury alone; but this does not mean that the jury is at liberty, under the guise of passing upon the credibility of a witness, to disregard his testimony, when from no reasonable point of view is it open to doubt. The complete testimony of the agent in this case appears in the record. A reading of it discloses no lack of candor on his part. It was not shaken by cross-examination; indeed, upon this point, there was no cross-examination. Its accuracy was not controverted by proof or circumstance, directly or inferentially; and it is difficult to see why, if inaccurate, it readily could not have been shown to be so. The witness was not impeached; and there is nothing in the record which reflects unfavorably upon his credibility.

course, be trumped by any negative impression that the trier of fact may have on a witness' demeanor; but here, the members of the Board who decided the case did not see or hear Belcher testify. Although "a trial court may disregard the testimony of a witness even absent directly conflicting testimony, it cannot treat the evidence arbitrarily." *Lynn v. Lynn,* 617 A.2d 963, 971 (D.C.1992) (citations omitted). Consequently, because the Board, without explanation, apparently ignored uncontradicted testimony, and because the witness' demeanor or manner of testifying could not have been a factor in the Board's disposition, we cannot say that the Board's contested finding is supported by substantial evidence. Indeed, we are aware of no reasonable basis for the Board's failure to consider, or even to mention, Belcher's uncontroverted testimony at all.

Accordingly, on remand, the Board must reconsider Belcon's claim for 243.2 cubic yards under PCO No. 3 and must give appropriate consideration to Belcher's testimony. In the absence of some persuasive basis (which, if it exists, must be made clear and explicit in the Board's decision on remand), Belcher's evidence with respect to this claim should be accepted as true.[10]

C. *PCO No. 4—Undercut Excavation and Backfill.*

Proposed Change Order No. 4—Undercut Excavation and Backfill covers Bel-con's creation of backfill through the excavation of soil at the wastewater treatment plant. The contract price for this work was $30.00 per cubic yard. The District estimated that it would need 25 cubic yards, approximately 5000 cubic yards less than Belcon eventually claimed. The Board found that, in addition to the 114.2 cubic yards for which the District was willing to compensate Belcon, Belcon was entitled to be compensated in the amount of $32,961.00 for an additional 1098.7 cubic yards. Belcon claims that this finding of fact is not supported by substantial evidence, and it requests compensation for excavation of an additional 2756.89 cubic yards, namely $82,706.70. We agree in part with Belcon.

1. *Item 1.*

 Although the District does not argue the point, Belcon concedes that the Board erred in finding that the company provided 5.7 cubic yards of material pursuant to Item 1 of PCO No. 4. The Board relied upon the same evidence (*i.e.,* the daily job report of August 15, 1984) with respect to PCO No. 4. as it considered when it found that Belcon had provided 5.7 cubic yards of structural backfill in conformity with PCO No. 3. The August 15 report, however, reflects the provision of only 5.7 cubic yards of fill, and not twice that amount. Because the entry in the

This passage must, of course, be read with the caveat that even uncontradicted testimony need not and should not be credited if the witness comes across to the trier of fact as a liar or charlatan, or as having a deficient and unreliable memory, but no such consideration applies here. "Where men [or women] of reason and fairness may entertain differing views as to the truth of the testimony, whether it be uncontradicted, uncontroverted or even undisputed, evidence of such a character is for the [trier of fact]." *Ferdinand v. Agri-* *cultural Ins. Co.,* 22 N.J. 482, 126 A.2d 323, 329 (1956).

10. It does appear that, on another issue, the Board believed the testimony of the District's engineer, Neukirk, over that of Belcon's president, Belcher. See note 8, *supra.* It is one thing to discredit controverted evidence and quite another to reject *uncontradicted* testimony. If Belcher's credibility has been generally undermined in some way, the Board's decision contains no explanation as to how this came about.

report concerns "structural" fill, the subject of PCO No. 3, it supports a finding only pursuant to that claim, and not in relation to PCO No. 4. Accordingly, the award of $171.00 (5.7 c.y. × $30.00) for provision of material pursuant to Item 1 cannot stand; the Board should determine if the record supports any award in connection with this item.

2. *Items 2, 5, 6, 7, 9, and 10.*

■ Belcon argues in conclusory fashion that "when the record as a whole is properly considered," the company should have been awarded a total of 71.4 cubic yards, or $2142.00, for Items 2, 5, 6, 7, 9, and 10. Belcon does not cite to the record to support this claim. The record "as a whole," which Belcon has asked the court to "properly consider," fills four large boxes to the brim. "It is not our obligation to comb through the voluminous record in this case to determine whether there is any evidence to support [Belcon's] argument." *Landesberg v. District of Columbia Dep't of Employment Servs.*, 794 A.2d 607, 618 (D.C.2002); *see also* D.C.App. R. 28(e) (2003) (references to the record must be supported by citations to specific page numbers). Accordingly, Belcon's claim that the Board erred in relation to these items of PCO No. 4 has not been established.

3. *Item 12.*

■ With respect to PCO No. 1, the District conceded that Belcon was entitled to an additional payment of $930.00. A portion of that amount was payable to Belcon for providing 40 cubic yards of borrow embankment fill in conformity with Item 22 of that PCO. According to Belcon, the District's concession with respect to the $930.00 logically compels the conclusion that the District is obliged to pay for an additional 112 cubic yards of fill, in conformity with Item 12 of PCO No. 4. These two items, says Belcon, in effect, are flip sides of the same coin.

The parties agree that Belcon moved a total of 282 cubic yards of borrow embankment fill pursuant to Item 22 of PCO No. 1.[11] Belcon claims that this entire amount came from the company's excavation of earth, as required by Item 12 of PCO No. 4. Because the Board awarded only 170 cubic yards to Belcon under the provisions of Item 12, Belcon seeks credit for the difference, *i.e.*, for 112 additional cubic yards.

The Board did not address the question whether these two items are connected, and we cannot and do not decide that issue without assistance from the trier of fact. In light of the District's concession regarding the $930.00, to which the Board will be obliged to accord appropriate weight, and because there is some evidence that the Board found a relationship between Items 12 and 22 of the different claims,[12] we remand this issue to the Board with directions to reconsider Item 12 of PCO No. 4.[13]

---

11. The Board gave Belcon credit for 242 c.y. The District concedes that Belcon is entitled to payment for an additional 40 c.y.

12. The Board relied on some of the same evidence to support its findings under each of these two items.

13. Belcon argues further that there is a similar relationship between Item 21 of PCO No. 1 and Item 35 of PCO No. 4. Belcher testified, apparently without contradiction, that his company excavated 2450 cubic yards of material pursuant to Item 35 and used the material elsewhere on the project in performing the work required in Item 21. The Board described this uncontradicted testimony as "insufficient." In accordance with our discussion of PCO No. 3, *supra* pages 6–9, regarding uncontradicted evidence, the Board on remand must give appropriate consideration to Belcher's testimony regarding this issue. If

#### 4. *Items 19 and 28.*

 Belcon argues that it was entitled to credit for 27.8 cubic yards pursuant to Item 19 and for 93.7 cubic yards under the provision of Item 28. We agree in part as to Item 19 but not as to Item 28.

In support of its claim pursuant to Item 19, Belcon introduced a contemporaneous letter written to the District in which Belcon represented that the company had been "directed to remove and stockpile 27.8 c.y. of dirt." In addition, Belcher testified that "the District authorized" the placement of 27.8 cubic yards. The District did not contradict the representation in the letter at the time of construction, nor did it submit testimony contrary to Belcher's account. In the absence of some explanation not readily apparent from the record, the Board will be obliged to credit Belcher's uncontradicted evidence. See the discussion at pages 6–9, *supra.*

With respect to Item 28, Belcher testified that Hans Neukirk, a District employee, agreed to pay Belcon for 93.7 cubic yards of *borrow embankment fill,* which is the subject of PCO No. 1, and not of *undercut,* which is the subject of PCO No. 4. The testimony therefore does not support Belcon's claim, and Belcon has not identified any other evidence tending to show error by the Board. To the extent that Belcon is making an implicit legal argument that the Board misconstrued the contract, and is contending, as a matter of contractual interpretation, that the 93.7 cubic yards should have been treated as undercut, Belcon has failed to demonstrate that the Board's interpretation was unreasonable.

that testimony is rejected, the Board must explain the basis for the rejection.

#### D. *PCO No. 24—Perched Water Table.*

 .Belcon argues that the Board also erred in its disposition of Proposed Change Order No. 24—Perched Water Table. A perched water table is created when soil conditions prevent water from draining properly. According to Belcon, this lack of drainage causes plants and trees, in effect, to drown. When a perched water table was discovered on a portion of the Blue Plains site, the District requested Belcon to deal with this unanticipated problem. Belcon agreed, and the parties executed a contract change order pursuant to which Belcon was to be compensated for the additional work that would be required.

Before the Board, Belcon claimed that the District still owed it $910.00 for the purchase of fourteen trees and $36,000.00 for moving 2400 cubic yards of embankment fill at $15.00 per cubic yard. The Board granted Belcon's request for $910.00, but it denied the remainder of the claim, concluding that the placement of embankment fill was covered by the District's lump sum payment on the change order and not, as Belcon argued, under a separate provision for borrow embankment fill. We do not agree with the Board's disposition.

Change Order No. 1 provided that Belcon must, among other things, "regrade and provide proper drainage" to address the perched water table problem "for the lump sum" of $42,005.00. As the Board recognized, the order also incorporated by reference a letter from Kenneth L. Donnelly, the District's Acting Chief of the Bureau of Construction and Repair, to Mr. Belcher.[14] In that letter, Mr. Donnelly requested Belcon to submit a proposal to

14. Change Order No. 1, PR–6, explicitly stated that the change order was "[i]n accordance with [the] WASUA letter of December 1, 1983."

fix the perched water table, and he wrote, in pertinent part:

> *The embankment fill will be paid for under item No. 6 of the schedule of prices;* the chain link fencing will be paid for under item No. 37 of the schedule of prices.
>
> Please submit your detailed cost proposal for *the additional work* as soon as possible so that you can proceed with the work without further delay.

(Emphasis added.)

Standing alone, the italicized language might, in our view, reasonably be interpreted in two ways. Under the first plausible interpretation, the provision can be read to mean that Belcon should have *excluded* from its proposal the costs of embankment fill and chain link fencing. Because the letter states that these activities "will be paid for" under certain specified contract provisions, it is reasonable to infer that they would *not* be paid for pursuant to any other contract provision or subsequently executed change order. If this interpretation is correct, the request that Belcon submit a detailed cost proposal for "the additional work" refers only to work "in addition to" or "other than" embankment fill and chain link fencing.

A second reasonable interpretation of the letter is that the language excerpted above required Belcon to *include* the costs of embankment fill and chain link fencing in its proposal, but to do so at the rate established by the specified contract provisions, *i.e.,* Item Nos. 6 and 37 respectively. Under this reading, "the additional work" refers to all the work, including embankment fill and chain link fencing, which was required to address the problem posed by the perched water table. The Board,

adopting this interpretation, held that the letter "simply established a rate for payment but did not break out the activity or costs for placing the fill from the other activities and costs that were the subject of Change Order No. 1."

The Board's reading of Mr. Donnelly's letter does not, however, account for other evidence in the record. Belcon's response to the District, contained in a letter dated December 6, 1983, from Mr. Belcher to Mr. Donnelly, explicitly *excluded* the costs of embankment fill; Belcher wrote that the proposal was for "costs *other than* embankment fill and fencing." (Emphasis added.) If the District's position at the time was that these costs should be *included,* one would expect to find some evidence of that position in the record, *e.g.,* a request that Belcon amend its proposal. But the record does not reflect that the District made such a request, and the District's apparent silence in response to Belcher's letter is telling.

In addition, Belcher testified, again without contradiction, that the District agreed to pay the company separately for 2400 cubic yards of embankment fill. Apparently, the District later refused to honor its agreement solely because, as Belcher testified, the District's representative believed that "$15 a cubic yard was too much to pay" for the placement of dirt which the District had provided for free. Indeed, it does not appear that the District ever argued in favor of, or even requested, the interpretation of the letter adopted by the Board.

When this additional evidence is considered, the only reasonable reading of Donnelly's letter is that it did more than merely establish the rate of payment.[15] The

---

15. In light of the evidence described above, we are unable to agree with the Board's conclusion that "[t]here is no evidence in the record that Belcon or the District intended to preserve [embankment fill] for payment out-

letter reveals that the District agreed to pay Belcon for embankment fill, as well as for chain link fencing, under the contract provisions specified in the letter. The lump sum set forth in the change order was therefore designed to compensate Belcon only for work on the perched water table *other than embankment fill and chain link fencing.* On remand, the Board must reconsider the issue accordingly and determine whether there is any legitimate reason why Belcon should not be paid at the rate it requested, namely, $15.00 per cubic yard.

### E. *PCO No. 26—Soils Amendment Program.*

■ Belcon claims that the Board made errors of fact and law with respect to Proposed Change Order No. 26—Soils Amendment Program. We agree with Belcon in part.

While the work pursuant to the contract was being carried out, Belcon and the District discovered that some of the soil at the treatment plant contained too many soluble salts, and that it was therefore excessively alkaline. This condition made the soil inhospitable to trees and shrubs and encouraged the growth of weeds. Under the provisions of a contract change order, Belcon was directed to remedy the problem by adding an acidic mixture of sulfur and iron sulfate to the soil.

The change order specified that Belcon would be compensated on a time and materials basis. To support its claims for compensation, the company was required to record its work daily on a form known as

the SE–330 Extra Work Record. In most instances, Belcon did so. The company claims, however, that it sometimes could not record its work on an SE–330 form because the District failed to issue the form or, more often, disputed the amount of work done and refused to sign the form unless it reflected only amounts that were undisputed. In the proceedings before the Board, Belcon sought compensation for unrecorded work and for related costs.

The Board denied the majority of these claims for lack of evidentiary support.[16] It explained that

[t]he principal difficulty with [these claims] is that Belcon failed to make the Form SE–330 Extra Work Records a part of the appeal record. We cannot determine for which days SE–330 Forms were completed and the type and number of hours captured on each SE–330 that was issued. Thus, it is difficult to determine whether Belcon was previously compensated for the claimed hours....

In short, the Board faulted Belcon for failing to prove that a greater award would not result in double recovery.

This issue, however, was not raised by the District or contested before the Board. According to Belcon, the District never argued that Belcon was seeking an award for work and costs that had already been paid, and the District does not dispute Belcon's assertion. Moreover, and by contrast, the District did assert, as to an entirely unrelated item, that Belcon was

---

side of the subsequently executed change order."

**16.** Belcon sought $24,554.54 for eighteen days on which the District failed or refused to issue an SE–330 form (PCO No. 26, Item 2) and $7038.34 for thirty-one days on which the

District required Belcon to record less work than the company claimed to have performed (PCO No. 26, Item 3). The Board allowed only $4,422.24 for Item 2, and it denied Item 3 completely.

seeking a double recovery, and it is therefore apparent that, when the District believed that Belcon was doing so, it raised the issue explicitly.[17] But with respect to the claim now under discussion, Items 2 and 3 of PCO No. 26, the District argued only that it was not obliged to pay for any work that Belcon claimed to have done if that work was not recorded on an SE–330 form.[18] The District did not raise the defense that Belcon had been compensated previously, and the company therefore was not on notice that it would be obliged to respond to such a contention. Belcon therefore cannot fairly be faulted for failing to introduce evidence to rebut a defense that was never raised.

Accordingly, the Board must reconsider this claim on remand. In light of the District's defense, the question on remand will be whether Belcon *worked* during certain hours on the disputed days, not whether Belcon has already been *paid* for working during those hours.[19]

## IV.

## CONCLUSION

As we have noted at the outset, the construction work that brought this case to our court was performed almost twenty years ago. Because we have reluctantly found it necessary to remand the case to the Board for further proceedings, there may well be further disputes as to the facts and law, and perhaps a second petition for review may eventually be submitted to this court. Unless the parties are willing to negotiate constructively, or to submit to some form of alternative dispute resolution, there is no assurance that the case will have been resolved five years from now. A dispute over the amount of payment due on a government contract, or any other contract, ought surely to be resolved in less than a quarter of a century.

As an appellate court, it is our responsibility to decide issues of law. But however we decide these issues, justice delayed is justice denied. All parties, as well as the Board, should surely view further delay as intolerable and as potentially subjecting the entire process to ridicule. Reasonable people acting reasonably should be able to resolve this case fairly, and to put an end to it, in a matter of months, if not weeks. We hope that this will occur, but meanwhile, the litigation continues. Accordingly, the decision of the Board is vacated, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

---

17. The Board found that "[f]or Item 4 [of PCO No. 26], the District stated that the costs are already included in Item 1."

18. The Board implicitly rejected this argument when it awarded Belcon $4,422.24 for work that was not recorded on SE–330 forms.

19. Belcon also claims that the Board erred in not awarding certain related costs for equipment and markups on labor. It does not appear that the Board considered this claim. It should do so on remand.