*Notice:* *This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-AA-241

DISTRICT OF COLUMBIA, PETITIONER,

v.

DISTRICT OF COLUMBIA CONTRACT APPEALS BOARD, RESPONDENT,

and

FORT MYER CONSTRUCTION CORPORATION, INTERVENOR.

On Petition for Review of a Decision of the
District of Columbia Contract Appeals Board
(CAB-1454)

(Argued December 9, 2020　　　　　　　　　Decided November 18, 2021)

*James C. McKay, Jr.*, Senior Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, and *Carl J. Schifferle*, Acting Deputy Solicitor General, were on the brief, for petitioner.

*Mark D. Poindexter* filed a statement in lieu of brief for respondent.

*Hanna Lee Blake*, with whom *Joseph A. Figueroa* was on the brief, for intervenor.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and GLICKMAN, and THOMPSON,[*] *Associate Judges*.

---

[*] Judge Thompson was an Associate Judge of the court at the time of argument. Although her term expired on September 4, 2021, she will continue to

(continued…)

THOMPSON, *Associate Judge*: In this matter, the District of Columbia (the "District") has petitioned for review of a November 20, 2018, decision of the District of Columbia Contract Appeals Board (the "CAB" or the "Board"). In its decision, the CAB ruled that prime contractor Fort Myer Construction Corporation ("Fort Myer"), on behalf of its subcontractor Metro Paving Corporation ("Metro Paving"), is entitled to damages of $251,237, plus interest, as an equitable adjustment for "increased labor costs incurred by Metro Paving when the District changed the contract's original wage payment requirements throughout the option year terms" of a contract between the District and Fort Myer. We affirm the CAB's decision because it is supported by substantial evidence and because the District has not shown that it is unreasonable or contrary to law.

---

(…continued)

serve as an Associate Judge until her successor is confirmed. *See* D.C. Code § 11-1502 (2012 Repl.). She was qualified and appointed on October 4, 2021, to perform judicial duties as a Senior Judge and will begin her service as a Senior Judge on a date to be determined after her successor is appointed and qualifies.

The following facts, found by the CAB, are undisputed except as noted. In April 2006, Fort Myer and the District of Columbia Department of Transportation ("DCDOT") entered into a one-year, fixed-price contract (the "prime contract") for services related to the resurfacing of roadways in the District.[1] DCDOT reserved the right to extend the prime contract for up to four option years. The project was federally funded, and the contract therefore included provisions requiring that all workers be paid at least minimum wages in accordance with the Davis-Bacon Act.[2] The contract solicitation specified that the Paving and Incidental Grading wage and fringe benefit rates contained in Department of Labor ("DOL") General Wage Rate Decision No. DC2003001, Modification No. 35 (February 3, 2006) ("Wage Decision No. 1") applied to the contract. Before the CAB, the parties stipulated that "[e]ach modification to the Prime Contract that extended the performance time

---

[1] Specifically, the contract work involved repairing and replacing curbs, gutters, sidewalks, and driveway entrances; construction of wheelchair/bicycle ramps; furnishing sewer-water manhole frames and basin tops; providing steel plating over the roadway repairs; and other incidental work.

[2] *See* 40 U.S.C. § 3141 *et seq.*

for another option year incorporated a new General Wage Decision containing increased wage rates applicable to the Project for the relevant option year."

Fort Myer entered into a subcontract with Metro Paving to perform the concrete-related work on the project.[3] The CAB found that Metro Paving utilized the pay rates set forth in Wage Decision No. 1 to prepare the labor component of its pricing for the base year and for all four option years under its subcontract and that the successful bid Fort Myer submitted to the District incorporated the pricing it obtained from Metro Paving. Fort Myer's total prices for the base year and each option year were based upon estimated quantities and unit prices for the items of work detailed in the contract solicitation.

The District of Columbia Standard Contract Provisions for Use with Specifications for District of Columbia Government Construction Projects 1973 (the "Standard Contract Provisions") were included in Fort Myer's prime contract. Article 3 of the Standard Contract Provisions specified that the Contracting Officer could make changes to the contract's requirements through the issuance of written

---

[3] The concrete-related work included trench excavation and backfilling, graveling, rebuilding and replacing standard basins, adjusting and converting fire hydrants, and resetting and adjusting stone curbs.

change orders and that, in the event that changes increased the costs of performance to the contractor, the contractor would be eligible to receive a price adjustment, including reimbursement of its additional costs related to subcontractor work.[4] Metro Paving's subcontract required it to comply with all changes the District made to Fort Myer's prime contract.

The prime contract concluded at the end of Option Year 4 on May 10, 2011. On May 24, 2011, Fort Myer submitted a letter and a subsequent certified claim to the DCDOT Contracting Officer on behalf of Metro Paving, requesting an equitable adjustment. Specifically, Fort Myer sought $286,324.41 for increased labor costs incurred by Metro Paving after the District issued change orders that incorporated new DOL Wage Decisions into the contract. Fort Myer asserted that the Wage Decisions required the payment of higher wages and benefits and thus caused Metro Paving's labor costs (for power equipment operators, cement masons, laborers, and truck drivers) to increase beyond what it anticipated when it submitted its bid.

---

[4] Specifically, Article 3.C states in pertinent part that "[i]f any change under this Article causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of this work under the Contract, . . . an equitable adjustment shall be made[.]"

After a lengthy delay during which the Contracting Officer failed to issue a final written decision on Fort Myer's claim, Fort Myer appealed the deemed denial of its claim to the CAB. The CAB conducted a three-day hearing on the merits. After a stipulation between the parties, what remained before the CAB was Fort Myer's claim to recover increased labor costs incurred by Metro Paving in the amount of $276,361.37. At the hearing, Metro Paving's Vice President, Stephen Fye, testified about the labor cost increases incurred by Metro Paving during Option Years 1-4. For each year, he identified the specific labor categories for which wages were increased pursuant to the option-year Wage Decisions (Wage Decision Nos. 2, 3, 4, and 5) that were the subjects of the District's change orders, and he showed the difference between the hourly wages and fringe benefits originally required by the contract and the increased hourly wages and fringe benefits required under the revised option-year wage requirements. He also explained his calculation of the cumulative total of the wage differentials for each labor category throughout the option periods. Of particular note, Mr. Fye testified that in developing Metro Paving's bid prices for the option years, he included in Metro Paving's escalated option-year prices amounts to account for anticipated increases in fuel and material costs, but did not include any contingency to account for potential labor increases in the option years above the pay rates specified in Wage Decision No. 1. Metro Paving's President, Mitchell Otero, testified about

the "labor burden rate" calculation which he formulated to determine Metro Paving's indirect costs for the option years (to account for labor-related costs including Social Security, Medicare, federal and state employment taxes, general liability and workers' compensation insurance).

In its opinion resolving Fort Myer's claim, the CAB found "no merit" in the District's arguments that Metro Paving "bore the risk that it could perform the contract at the prices it proposed to Fort Myer in pursuit of the underlying contract" and that Metro Paving's "failure to anticipate that there would be increases in the contract's wage requirements during the option years in preparing its pricing [was] not a basis to grant it relief." The CAB noted that the contract's changes clause provided that Fort Myer "would be entitled to a price adjustment including costs related to its subcontractor's performance" "in the event that the District changed the contract's requirements and increased the cost of performance." The CAB cited the Contracting Officer's acknowledgment in his testimony that Metro Paving "in fact, incurred increased labor costs as a result of paying higher wages to its workers in complying with the new, and consecutive, wage determination decisions that the District applied to the contract by amendment during each of the four option year periods" and emphasized the Contracting Officer's testimony that "he would have granted [Fort Myer's] claim if

[Fort Myer had] sufficiently demonstrated that Metro Paving's labor costs increased beyond what it anticipated for each option year."[5] The CAB found that this testimony "directly undermine[d]" the District's argument that the nature of the contract as a fixed-price contract precluded any adjustment.

The CAB rejected the District's argument that the evidence "'lacked sufficient documentation' to demonstrate how the labor component of Metro Paving's unit prices w[as] impacted by the option year wage determinations." The CAB observed that the Contracting Officer "was unable to articulate to the Board the nature of the additional cost detail that [Fort Myer] was supposedly required to provide to further substantiate its claim for increased labor costs due to the modified wage determinations" and was "unable to refer the Board to any provision of the contract or District agency standards or protocols by which he was supposedly judging the sufficiency of the cost information" Fort Myer provided to support its request for a price adjustment. The CAB also highlighted the

---

[5] The CAB quoted the following hearing testimony:

> Board: Theoretically speaking, had the contractor done a detailed analysis which showed…that their labor costs by virtue of the change to the wage determination had increased beyond what they had proposed for that option year, then would you have found entitlement?"
>
> Contracting Officer: Yes.

Contracting Officer's concession "that there [is] no 'exact science' used to analyze a contractor's unit prices to determine whether there was an overall impact to its originally proposed labor costs as the result of revised wage determinations made applicable to the contract by the District." The CAB found that Fort Myer "provided a preponderance of evidence to demonstrate the extent of the additional labor costs incurred by Metro Paving," based in part on the detailed testimony by Metro Paving's Vice-President, which relied on certified payroll records. The CAB stated that it reviewed and "verified the accuracy[] and adequacy of [Metro Paving's] calculation of the ongoing and cumulative impact of the wage increases" and noted that the District had not rebutted the accuracy of Metro Paving's figures.

Additionally, the CAB rejected the District's reliance on Federal Acquisition Regulation ("FAR") § 22.404-12(c)(1) (48 C.F.R. § 22.404-12(c)(1)), which references "preclu[sion of] a price adjustment due to the incorporation of new wage determinations during option years of a fixed-price contract where the contractor bid separate prices for each option period." Citing 48 C.F.R. § 1.101 (2018), the CAB reasoned that "the requirements of the FAR do not apply to this procurement" because "[t]he FAR establishes policies and procedures governing procurements conducted by federal executive agencies, and not the District of Columbia government."

The CAB accepted Fort Myer's claim in the amount of $251,237.62. The CAB concluded that Fort Myer and Metro Paving had failed to substantiate their claim for an additional 10% in overhead, but ruled that they were entitled to recover profit on increased labor costs, plus interest.

The District now argues that the CAB erred in awarding that adjustment, on several primary grounds. First, the District contends that under the Standard Specifications included in the bid solicitation, Metro Paving was required to include labor costs in its pricing for each option year, and argues that its failure to do so was not a basis for an equitable adjustment when Davis-Bacon wages increased, as Metro Paving could have anticipated based on past experience and collective bargaining agreements. The District also asserts that the DOL wage decisions applicable to the option years were not the types of changes that fall within the scope of the contract's Changes clause and equitable adjustment provision. Further, the District asserts that awarding an equitable adjustment is inconsistent with the FAR principle that if a contractor was provided "the opportunity to bid or propose separate prices for each option period," "[t]he contracting officer must not further adjust the contract price as a result of the

incorporation of a new or revised wage determination at the exercise of each option to extend the term of the contract."

Finally, the District argues that the CAB erred in awarding an equitable adjustment because Fort Myer did not meet its burden of demonstrating that Metro Paving was injured as a result of the DOL Wage Decisions. The District highlights that with the option-year price escalations, the total increase in Metro Paving's prices over the option years was $468,511.78, while the labor cost increases it claimed for the same period totaled only $179,961.79. The District argues that Metro Paving could not meet its burden of proving entitlement to an equitable adjustment without showing that the increased labor costs increased its costs of performing "over and above the escalated prices that it received each option year."

## II.

The scope of our review of the Contract Appeals Board's decisions is well-established. "We review decisions of the Contract Appeals Board deferentially." *Belcon Inc. v. District of Columbia Water & Sewer Auth.*, 826 A. 2d 380, 384 (D.C. 2003). "We give great deference to the CAB's factual findings[,]" *Rustler*

*Constr., Inc. v. District of Columbia*, 211 A.3d 187, 192 (D.C. 2019), which "'shall be final and conclusive and shall not be set aside unless the decision is fraudulent, arbitrary, capricious, or so grossly erroneous as to necessarily imply bad faith, or if the decision is not supported by substantial evidence,'" *Belcon*, 826 A.2d at 384 (quoting D.C. Code § 2-309.07 (2001)). "Evidence is substantial when 'a reasonable mind might accept [it] as adequate to support a conclusion.'" *Id.* (quoting *Epstein, Becker & Green v. District of Columbia Dep't of Emp. Servs.*, 812 A.2d 901, 903 (D.C. 2002)); *District of Columbia v. Heman Ward, Inc.*, 261 A.2d 836, 839 (D.C. 1970) ("To determine whether the Board's findings were supported by substantial evidence, we must look to the entire record, or those parts to which the parties refer us, and ascertain whether such findings could be fairly and reasonably made.").

"Our review of the [Board's] legal ruling[s] is de novo, for 'it is emphatically the province and duty of the judicial department to say what the law is.'" *Belcon*, 826 A.2d at 384 (citing *Harris v. District of Columbia Off. of Worker's Comp.*, 660 A.2d 404, 407 (D.C. 1995)). But "[t]he Board has expertise in contract appeals, and 'legal interpretations by tribunals having expertise are helpful even if not compelling.'" *Belcon*, 826 A.2d at 384 (quoting *District of Columbia v. Organization for Env't Growth, Inc.*, 700 A.2d 185, 198 (D.C. 1997));

*see also District of Columbia v. C.J. Langenfelder & Son, Inc.*, 558 A.2d 1155, 1160 (D.C. 1989) (stating that the CAB's cases "supply authoritative construction of the equitable adjustment provisions of the District's contracts"). We "accord 'great weight' to the Board's construction of a government contract, so long as that construction is not unreasonable." *Belcon*, 826 A.2d at 384 (*Dano Res. Recovery, Inc. v. District of Columbia*, 620 A.2d 1346, 1352 (D.C. 1993)). On questions of law, we look as well to "decisions of the United States Court of Appeals for the Federal Circuit, the former United States Court of Claims and its successors, and the various federal boards of contract appeals, 'all of which have particular expertise in this area.'" *Organization for Env't Growth*, 700 A.2d at 198 (citations omitted).

## III.

We begin our analysis with the District's contention that Metro Paving was required to include labor costs in its pricing for each option year and that its failure to do so means that no equitable adjustment was warranted. The District emphasizes the contracting officer's testimony that labor costs were to be included in the unit prices bid for the contract. There is no dispute, however, that Metro

Paving's unit prices included a (base-year) labor cost component; the issue is whether Metro Paving was required to include in its unit prices for each option year an allowance for labor costs as inflated by then as-yet unissued DOL Wage Decisions for the option years. The contract, including the Standard Specifications, said nothing about that, and we are unable to conclude that it was arbitrary or unreasonable for the CAB not to read the contract as requiring that those increased labor costs be anticipated and reflected in the unit prices that were bid. To the contrary, the CAB reasonably relied on the Supreme Court's cautionary note against practices that would encourage contractors to "submit inflated bids to take into account the possibility that [because of Davis-Bacon wage determinations] they would have to pay wages higher than those set forth in the specifications." *Univs. Rsch. Ass'n, Inc. v. Coutu*, 450 U.S. 754, 783 (1981). Moreover, the CAB relied on the fact that the District's contract modification for Option Years 1 and 2 contained language stating that Fort Myer "may" be entitled to an equitable adjustment — language that is inconsistent with the District's litigating position that no additional reimbursement could be available for the option years given that Metro Paving had the opportunity to estimate, and to incorporate in its pricing, an allowance for the anticipated impact of additional DOL wage decisions applicable to the option years.

The District also argues that its incorporation of the then-current DOL minimum wage decisions for each option year "did not change [Metro Paving's] obligations under the contract" and thus was not a change of the type described in Article 3.A of the Standard Contract provisions (a "change in work") that justified an equitable adjustment under Article 3. However, Article 3.A.2 provides non-exclusive examples of "changes in the work," and a change in the minimum wage rate that must be paid to specified categories of workers who perform the work can reasonably be considered a change in the manner of performance of the contract work or other change in the work that justifies an equitable adjustment. That reading harmonizes Article 3.A with Article 3.C, which states that "an equitable adjustment shall be made" for "any change under this Article [that] causes an increase or decrease in the Contractor's cost of . . . the performance of any part of this work under the Contract."[6] In addition, this court has observed that equitable adjustments "are appropriate . . . when new obligations are substituted for pre-existing obligations." *Org. for Env't'l Growth*, 700 A.2d at 203. It is reasonable to regard a requirement to pay the minimum wages under a new wage decision rather than the rates payable under the prior wage decision as a new obligation that can

---

[6] We also note that section 9 of the prime contract provides that if issuance of the contract award letter is delayed, "all intervening modifications (or new wage decision) are applicable" and "[t]he contractor will be reimbursed this added labor cost." Thus, section 9, too, evinces an intent to treat new wage decisions as grounds for reimbursing a contractor's additional labor costs.

support an equitable adjustment. Further, as support for its interpretation of the contract's standard Changes clause, the CAB relied on two Davis-Bacon Act cases, *W.G. Yates & Sons Constr. Co. v. Gen. Servs. Admin.*, CBCA No. 1495, 11-1 BCA ¶ 34,638, 2010 WL 5904458 (Dec. 21, 2010) ("[W]hen the contracting officer directs a specified change in contract terms and this change causes an increase . . . in the cost of . . . performance of contract work, the contracting officer shall make an equitable adjustment to the contract price."), and *Geronimo Serv. Co.*, ASBCA No. 14686, 70-2 ¶ 8540, 1970 ASBCA LEXIS 274 (Oct. 26, 1970) (holding that the contractor was entitled to an equitable adjustment of contract price pursuant to contract's changes clause where government's issuance of a change order to exercise an option year included modification to contract's applicable wage determination).[7] Given all the foregoing, we cannot say that the CAB's interpretation of the Changes clause was unreasonable: that "in the event that the District changed the contract's requirements and increased the cost of performance,

---

[7] *See also In re C & H Reforesters, Inc.*, 1988 AGBCA LEXIS 27, *14-15 (Dep't Agric. B.C.A. Aug. 16, 1988) (acknowledging that there is secondary authority "to the effect that since wages are not part of the work under the contract, it is questionable whether an order increasing wages is within the bounds of the [c]hanges clause" (citing J. Cibinic, Jr. and R. Nash, II FEDERAL PROCUREMENT LAW, note 4 at 1222 (1980)), but collecting cases providing authority for use of the changes clause to adjust the contract price when changes in wage determinations made applicable to a contractor's performance increase the cost of that performance).

[Fort Myer] would be entitled to a price adjustment including costs related to its subcontractor's performance."[8]

In asserting that the CAB award decision is inconsistent with FAR § 22.404-12 (48 CFR § 22.404-12), the District relies on this court's case law recognizing that "[w]ith few exceptions, District contracting practice parallels federal government contract law." *Organization for Envt'l Growth*, 700 A.2d at 198 (quoting *Dano Res. Recovery*, 620 A.2d at 1351). But the problem with the District's reliance on the principle articulated in FAR § 22.404-12 is that it overlooks a part of what 48 CFR Part 22 prescribes. As the Armed Services Board of Contract Appeals recognized recently, FAR 22.407(e) specifies that a contract clause is to be inserted into a contract to effect the "no adjustment" method. *See Appeal of Gulf Pac. Contr., LLC*, 2021 ASBCA LEXIS 203, *10-11 (A.S.B.C.A. Sept. 16, 2021); *see also* 48 C.F.R. § 22.407(e) (requiring a federal contracting officer to "[i]nsert the clause at 52.222-30 . . . if the contract is expected to be . . . [a] fixed price contract . . . that will contain option provisions by which the

_____

[8] And while it is true, as the District argues, that the required wage changes were DOL-initiated and not independent decisions of the District, the parties stipulated that the District incorporated the DOL Wage Decisions in written change orders, a practice that the CAB could reasonably regard as bringing the Wage Decisions within the scope of the Changes clause.

contracting officer may extend the term of the contract, and the contracting officer determines the most appropriate contract price adjustment method is the method at 22.404-12(c)(1)"); 48 C.F.R. § 52.222-30 (setting forth the contract clause whose insertion effectuates the provisions of FAR § 22.404-12(c)(1)). Here, as Fort Myer emphasizes, the District did not insert such a clause into the prime contract. In addition, FAR § 22.404-12 specifies that the "no-adjustment" method generally is used in contracts with options to extend the term "that are not expected to exceed a total of 3 years." 48 CFR 22.404-12(c)(1). While that does not appear to be a rigid rule, it is another reason why we conclude that FAR § 22.404-12 cannot fairly be read into the contract in issue here[9] and did not put Fort Myer or Metro Paving on notice that the option-year payments could not be adjusted in the event of DOL wage decisions superseding Wage Decision No.1. We conclude that the CAB did not err in rejecting the District's argument premised on FAR § 22.404-12.

Finally, we turn to the District's argument that it was error for the CAB to award an equitable adjustment because Fort Myer did not demonstrate that Metro

---

[9] *See W.G. Yates*, 2010 WL 5904458, (rejecting federal agency's argument that FAR § 22.404 should be read into the contract by operation of law; reasoning that "only a mandatory contract clause that expresses a significant or deeply ingrained strand of public procurement policy is considered to be included in a contract by operation of law") (citing, inter alia, *S.J. Amoroso Constr. Co. v. United States*, 12 F.3d 1072, 1075 (Fed. Cir. 1993)).

Paving was injured as a result of the DOL Wage Decisions. The District implies that Metro Paving could not have been injured if the amounts the District paid based on Metro Paving's option-year increases exceeded the additional labor costs Metro Paving incurred because of the DOL Wage Decisions. The District's argument is inconsistent with the Federal Circuit's guidance concerning what must be shown to warrant an equitable adjustment, and the District therefore has not shown that the CAB erred in rejecting the argument.

The Federal Circuit's decision in *Dalco Elecs. Corp. v. Dalton*, No. 93-1486, 1994 U.S. App. LEXIS 16698 (Fed. Cir. 1994), is instructive. In that case, the Federal Circuit partially reversed a decision of the Armed Services Board of Contract Appeals in a case brought by Cherokee Electronics Corporation (the former name of Dalco). The pertinent facts are set out in *Appeal of Cherokee Elecs. Corp.*, 93-1 B.C.A. (CCH) P25,522, 127165 (A.S.B.C.A. Oct. 5, 1992), *rev'd in relevant part sub. nom. Dalco Elecs. Corp. v. Dalton*, 1994 U.S. App. LEXIS 16698. The federal contract contained a number of unit prices that reflected allowances for direct labor, based upon wage rates set forth in the contractor's successful bid. *Id.* at 127161. The contractor negotiated labor rates with its employees and paid them at rates that were lower than the wage rates reflected in its proposal, but the federal agency paid the contractor at the higher

wage rates contained in the proposal. *Id.* at 127161-62. A clause in the contract recognized that DOL might determine that the contract was subject to the Service Contract Act and to the minimum wages required under that Act. *Id.* at 127162. The contractor warranted that its prices did not include any allowance for that contingency to cover increased costs, but the parties agreed that if DOL so determined, the contractor would pay the required wages. *Id.* After DOL made the anticipated determination, the contractor sought an equitable adjustment in an amount representing the difference between the wages and benefits the contractor had paid to its employees and the wages and benefits to which DOL found that they were entitled under the Service Contract Act. *Id.* at 127164. The contracting officer declined to pay that portion of the equitable-adjustment claim representing the difference between the billed contractual labor rates that were reflected in the contractor's proposal and in the contract award, and the amounts the contractor had actually paid to its employees. *Id.* The contracting officer took the position that the contractor's election to pay actual wages that were less than the amounts the government was paying the contractor for every unit should not entitle the contractor "to duplicate payment of this amount" and thus "enable the contractor to retain a profit margin much larger than that proposed and agreed to by the government." *Id.* at 127165. The Armed Services Board of Contract Appeals agreed with the contracting officer. *Id.* at 127165-67.

The Federal Circuit rejected the Armed Services Board of Contract Appeals position that the contract "barr[ed] recovery of . . . costs representing the difference between the estimated rates used in pricing the procurement and the lower wages Dalco eventually paid its workers." *Dalco*, 1994 U.S. App. LEXIS 16698, *7. The Federal Circuit held that "[t]he contractor was entitled to the full measure of increased direct costs it incurred as a result of the incorporation of [Service Contract Act] provisions, including the difference between the estimated rates used in preparation of the proposal and the lower rates actually paid to [the contractor's] employees." *Id.* at *9-10. In short, the Federal Circuit rejected the argument that, to qualify for an equitable adjustment, the contractor was obligated to show the type of injury (i.e., contract unit prices that were insufficient to cover the labor cost increases resulting from increases in the federally mandated minimum wages) the District argues was required here. *Accord, Geronimo Serv. Co.*, 1970 ASBCA LEXIS 274, *19 ("[A]ppellant became entitled to an equitable adjustment [simply] by virtue of the Government's exercise of its option and the change made in the applicable wage determination[.]").[10]

---

[10] As for the District's argument that "granting an equitable adjustment would run a considerable risk of giving [Metro Paving] a double payment for the same work," the CAB found as a factual matter that Metro Paving did not include in its prices an allowance for increased Davis-Bacon costs. We defer to that

(continued…)

In the instant case, the CAB reached a conclusion analogous to those in *Dalco* and *Geronimo Serv. Co.* Accordingly, although the District's argument has appeal, the CAB's decision is not "arbitrary, capricious, or so grossly erroneous as to necessarily imply bad faith," and thus we must sustain it. *Belcon*, 826 A.2d at 384.

## IV.

For all the foregoing reasons, the decision of the Contract Appeals Board is

*Affirmed.*

---

(…continued)

finding, as it is supported by substantial evidence and is not clearly erroneous. As described above, Mr. Fye testified that "he did not include any contingency in the original prices that Metro Paving bid for the project to account for potential labor increases in the option years above the pay rates set forth in Wage Decision No. 1" and that "Metro Paving only escalated its option year pricing in its original bid to Fort Myer to account for anticipated increases to its fuel and material costs based upon the fact that it expected its fuel and material costs to increase annually based upon feedback from its suppliers."

As the CAB observed, the contract's Change clause "did not require that a contractor provide a breakdown of its unit prices to support its request for payment of increased . . . costs arising from a[ny type of] District-ordered contract change." The record also contains no evidence that the District required from bidders an accounting of what costs, allowance for profit, etc. were reflected in the unit prices to which the District agreed. Given those facts, the District's argument — that the lack of documentation about what cost savings Metro Paving may have realized precludes an equitable adjustment — is not persuasive.