Richard A. HARRISON and Linda
Y. McMillan, Appellants,

v.

BOARD OF TRUSTEES OF the UNI-
VERSITY OF the DISTRICT OF
COLUMBIA, Appellee.

Nos. 97–CV–30, 97–CV–453.

District of Columbia Court of Appeals.

Argued May 4, 1999.
Decided Aug. 17, 2000.

James F. McConville, for appellants.

Robin C. Alexander, Washington, DC, for appellee. Charles L. Reischel, Deputy Corporation Counsel, also entered an appearance for appellee.

Before TERRY, SCHWELB, and RUIZ, Associate Judges.

TERRY, Associate Judge:

Appellants Harrison and McMillan are former educational service employees of the University of the District of Columbia ("the University" or "UDC"). Pursuant to a multi-phase reduction in force ("RIF"), Harrison's position was eliminated in November 1992 and McMillan's in September 1995. Both appealed their terminations to the president of UDC, but those appeals were rejected. In January 1993 Harrison and eight other former UDC employees sought review of UDC's action in the Superior Court. Their petitions were consolidated with one another, and three more were later consolidated with the first nine. The court denied all twelve petitions in a thorough and detailed memorandum opinion. *Harmon v. Board of Trustees of the University of the District of Columbia,* No. 93–MPA–03 (D.C.Super.Ct. August 4, 1994) (Burgess, J.). Harrison and several other petitioners appealed to this court. Some of those appeals were dismissed, and in two of the others the trial court's rulings have been affirmed.[1] McMillan also petitioned the Superior Court for review of her discharge, but her petition was likewise denied. Her appeal from that ruling

---

1. *Hoage v. Board of Trustees of the University of the District of Columbia,* 714 A.2d 776 (D.C.1998); *Gilmore v. Board of Trustees of* *the University of the District of Columbia,* 695 A.2d 1164 (D.C.1997).

was consolidated with that of Mr. Harrison.

Both appellants challenge the validity of the University's RIF rules on several grounds. They claim that the rules violated the District of Columbia's RIF policies and were designed to limit employees' rights. They each challenge their individual terminations on separate additional grounds. We conclude that appellants' claims are largely based on misinterpretations and misunderstandings about the relevant statutes and rules, and hold that the RIF rules are neither unreasonable nor illegal. Because we also find no merit in either appellant's individual claims, we affirm both judgments.

## I

The relevant facts in each of these consolidated cases are essentially undisputed.

### A. *Harrison*

On June 26, 1992, the University's updated RIF Rules went into effect. 8 DCMR §§ 1800 *et seq.* (1992); *see Hoage, supra* note 1, 714 A.2d at 778. In August of that year, UDC implemented its Administrative Management Plan, Phase I, which was designed to alleviate the University's financial problems by consolidating or eliminating several of its administrative units by means of a RIF. Among those units affected was the Office of Veterans Affairs, where Richard Harrison was employed as the program manager and assistant director of veterans affairs. On October 21, 1992, Harrison received a notice stating that, effective November 25, his position was being abolished and his employment terminated pursuant to the RIF. Harrison had worked at UDC and one of

its predecessor institutions for twenty-four years.

Harrison filed a timely request for review with UDC President Tilden LeMelle on November 4, 1992. He contended that the implementation of the new RIF rules was "subjective and illegal" and that the elimination of the Office of Veterans Affairs and his position violated 34 C.F.R. § 629.5, the federal regulation governing Veterans Education Outreach Program grants.[2] In a letter dated December 21, President LeMelle rejected Harrison's appeal, stating that, under the federal regulation, UDC only had to "maintain an office of veterans affairs that fulfills the functions required to provide the services for which the grant is made," not a "*separate* Office of Veterans Affairs" (emphasis in original). He also explained to Harrison that "[t]he competitive areas set forth in the new RIF rules are essentially the competitive areas that were set forth in the prior rules," and that the RIF procedures do not apply to temporary or contract employees because "[t]emporary employees have no retention rights and may be released at any time without effecting a reduction in force," and because the retention rights of contract employees are determined by their individual contracts, not by any RIF rules.[3]

Harrison filed a petition in the Superior Court for review of the president's decision. *See* Super. Ct. Agency Rev. R. 1; *Davis v. University of the District of Columbia,* 603 A.2d 849, 853 (D.C.1992) (educational service employee is not entitled to a hearing before the Office of Employee Appeals but may "invoke the general equitable jurisdiction of the Superior Court so that he would be afforded a right to a hearing"). The court in due course af-

---

**2.** This regulation, along with several others, has since been rescinded as "unnecessary and obsolete" because it was either "no longer necessary to administer the program, [has] been superseded by new legislation, or [was] issued to implement a program that is no longer funded." *See* 60 Fed.Reg. 27223–27226 (1995).

**3.** President LeMelle also addressed other issues raised by Harrison in his request for review. However, because Harrison has not raised those issues on this appeal, we deem them waived and do not discuss them here.

firmed the president's decision, concluding that it was supported by substantial evidence. Harrison then appealed to this court.

### B. *McMillan*

Linda McMillan was hired by the University on December 18, 1972, and eventually became the Education Program Administrator in the University College. On August 25, 1995, she received a notice informing her that her position was being terminated in accordance with the University's Administrative Management Plan, Phase III, and that she would be released on September 30. On September 8 McMillan filed a request for review with President LeMelle asserting, *inter alia*, that the termination of her position was unreasonable and that the rules governing the RIF were improper.[4] On October 23 President LeMelle affirmed McMillan's termination in a five-page, single-spaced letter addressing and rejecting each of her claims. On McMillan's petition for review, the Superior Court affirmed that decision, and McMillan appealed.

### II

### A. *Standard of Review*

 The standards governing our review of any administrative order are well settled. We review the factual findings of the agency for the limited purpose of determining whether there is substantial evidence to support them. *See, e.g., Sturgis v. District of Columbia Dep't of Employment Services*, 629 A.2d 547, 551 n. 3 (D.C.1993). "We cannot retry the facts or rehear the evidence." *Shepherd v. District of Columbia Dep't of Employment Services*, 514 A.2d 1184, 1186 (D.C.1986). "If this court, upon examining the record as a whole, concludes that the [agency's]

---

4. McMillan also made several other claims which she has not raised on this appeal. As in Harrison's case, we deem those matters waived.

5. Section 1–604.1, entitled "Policy," provides:

findings are supported by substantial evidence, it must accept those findings, even though there may also be substantial evidence in the record to support a contrary finding." *Baumgartner v. Police & Firemen's Retirement & Relief Board*, 527 A.2d 313, 316 (D.C.1987).

 Although our review of an agency's legal conclusions is *de novo, see KOH Systems, Inc. v. District of Columbia Dep't of Employment Services*, 683 A.2d 446, 449 (D.C.1996), "[a]n agency's interpretation of its own regulations or of the statute which it administers is generally entitled to great deference from this court." *Columbia Realty Venture v. District of Columbia Rental Housing Comm'n*, 590 A.2d 1043, 1046 (D.C.1991); *accord, e.g., Gunty v. District of Columbia Dep't of Employment Services*, 524 A.2d 1192, 1196 (D.C.1987). In this case, however, because the Comprehensive Merit Personnel Act (CMPA), D.C.Code §§ 1–601.1 *et seq.* (1999), is administered by the Office of Employee Appeals rather than UDC, we accord little or no deference to UDC's interpretation of the CMPA. *See District of Columbia Metropolitan Police Dep't v. Perry*, 638 A.2d 1138, 1144 (D.C.1994). On the other hand, we give considerable deference to UDC's interpretation of its own regulations governing RIF's.

### B. *Challenges to the RIF Rules in General*

Both appellants initially challenge the University's new RIF rules, 8 DCMR §§ 1800 *et seq.* (1992), under which their positions were eliminated. They claim that these RIF rules are inequitable because they ignore the express policy governing RIF procedures set forth in D.C.Code § 1–604.1 (1992),[5] and that the

It is the intent of the Council that the District's personnel management system provide for equitable application of appropriate rules or regulations among all agencies. Further, it is the intent of the Council that the rules, regulations, and standards issued by the personnel authorities under

new rules are designed to limit employees' rights and options while providing the University with the ability to "RIF high level administrators." In support of their argument, petitioners assert that because temporary and contract employees are exempt from the new rules, their own positions as permanent, full-time employees are less protected than they were under the old rules.

■ We note at the outset that the policy announced in section 1–604.1 is not intended, as appellants seem to believe, to require that UDC establish RIF rules or any other employment practices that are identical or even similar—other than in their equitable nature—to those governing other District of Columbia agencies. In a previous section of the CMPA, the Council of the District of Columbia specifically stated that UDC was to create its own rules governing employment. D.C.Code § 1–602.3(b) provides in part:

> The ... Board of Trustees of the University of the District of Columbia shall develop ... policies on classification, appointment, promotion, *retention,* and tenure of employees consistent with [its] educational mission[ ].... [Emphasis added.]

In another section, the Council specifically declared that the personnel management rules governing the educational employees of UDC were to be separate from those governing other District employees:

> [I]t is the purpose and policy of this chapter [the CMPA] to assure that the District of Columbia government shall have a modern flexible system of public personnel administration, which shall:

this chapter should be as flexible and responsive as possible and reflect an awareness of innovation in the fields of modern personnel management and public administration.

6. By comparison, the previous subsection, D.C.Code § 1–601.2(a)(2), provides:

* * * * *

> (3) Create *separate* personnel management systems for educational employees of ... the University of the District of Columbia[.]

D.C.Code § 1–601.2(a)(3) (emphasis added).[6] The plain language of these sections shows not only that UDC's employment practices need not be the same as those of other District government agencies and entities, but that the Council anticipated and expected that UDC's rules would be different from those governing other agencies if the University so decided. The Council delegated to UDC broad authority to fashion and administer its own personnel management systems, and we are bound by UDC's construction of the laws governing those systems, so long as UDC's interpretation is reasonable. *See Smith v. District of Columbia Dep't of Employment Services,* 548 A.2d 95, 97 (D.C.1988).

There is likewise no provision in the Code that requires UDC to adopt new RIF rules which are similar to those previously in effect. However, in this instance, contrary to appellants' assertions, UDC's new RIF rules are substantially similar to the old rules in many respects. Appellants' belief that their positions as permanent, full-time employees are somehow less protected under the new rules than they were under the old rules stems from their misinterpretation of the new rules. For example, the section of the old rules that listed the priority of employees in a RIF, which petitioners claim was arbitrarily left out of the new rules, was in fact included, virtually unaltered, in the new rules. The old rules provided that "Category 1 employees [*i.e.,* permanent, full-time salaried employees] shall have the highest priority for retention." 8 DCMR

It is the purpose and policy of this chapter to ... [c]reate uniform systems for personnel administration among the executive departments and agencies reporting directly to the Mayor of the District of Columbia and among independent agencies, boards, and commissions in the District of Columbia government.

§ 1137.1 (1988). The new rules establish the same priority but simply use different terminology. They list, "in descending order of retention standing," the retention register groups. 8 DCMR § 1809.4 (1992). At the top of that list are permanent, full-time salaried employees. Thus, under the new rules, such employees have the highest retention priority just as they did under the old rules.

■ Appellants also complain that temporary employees and contract employees are exempt from the new RIF rules. *See* 8 DCMR § 1800.7(f) and (g) (1992). Appellants apparently assume that, because those employees are not subject to the RIF rules, they are somehow benefited by that exemption, or have a higher retention priority, or that their exemption detrimentally affects appellants' retention priority standings. In fact, however, temporary employees and contract employees are exempt from the RIF rules not because they are afforded more protection, but because they have *no* retention protection under the rules. Indeed, temporary employees may be terminated at will without regard to the RIF rules. Moreover, the rules expressly provide that a competitive, full-time employee cannot be terminated while a temporary employee is retained. *See* 8 DCMR § 1815.1 (1992) ("A competing employee shall not be released from a competitive level while either of the following is retained in that level: (a) [an] employee with a specifically limited temporary appointment; or (b) [an] employee with a specifically limited temporary promotion"). A contract employee may have some retention protection, but if he or she does, such protection derives not from any rules but from the terms of that employee's contract, which governs such matters as tenure. Because contract employees bargain for their retention, their status in no way affects the RIF rules or their application to other employees such as these appellants. Moreover, the exemptions do not represent any real change in the rules; rather, the exemptions express what was previously implied in the earlier rules. Temporary employees have always been at-will employees, and the rights of every contract employee have always been determined by contract.

Appellants also contend that the new RIF rules unduly limit the scope of the competitive ("bumping") work areas to the "absolute smallest unit." Conceding that D.C.Code § 1–625.1 (1999) (part of subchapter XXV of the CMPA) does not apply to UDC, *see* D.C.Code § 1–602.3 ("educational employees shall not be covered by subchapter[ ] ... XXV of this chapter"), they nonetheless rely on section 1–625.1 as support for their position. That section requires each agency to be "considered a competitive area for reduction-in-force purposes." Citing this language, appellants maintain that an "equitable application of appropriate rules or regulations among all agencies" somehow requires UDC to establish rules that are identical, or at least substantially similar, to the rules governing other agencies. That is, according to appellants, UDC must establish competitive work areas that are university-wide. We are not persuaded.

■ The fact that the Council specifically exempted UDC from the statute requiring agencies to define competitive work areas as agency-wide demonstrates that it did not intend UDC to define its competitive work areas on a university-wide basis. Moreover, as we have pointed out, section 1–601.2(3) expressly instructs UDC to create "*separate* personnel management systems for educational employees." Because we conclude that the statutory language is clear, we need not address this point further. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (once a court determines that the meaning of a statute is clear, it need not determine whether the agency decision is based on a permissible construction of that statute); *accord, Columbia Realty Venture,* 590 A.2d at 1046 (citing *Chevron* ).

We are satisfied, in any event, that the Council's decision to exempt the University from the coverage of section 1–625.1 is logical and reasonable. An educational institution like UDC differs from most other government agencies in that its various parts serve significantly diverse functions. The individual schools instruct in different subjects and operate in distinct ways. The services provided by the educational entities within UDC necessarily differ significantly from those provided by the University's administrative units, as do the various parts from one another. To require UDC to move employees between its branches when implementing a RIF, as appellants urge us to do, would frustrate the financial benefits of the RIF because it would force UDC to retrain those persons being transferred between departments. There is also a significant possibility that, if the competitive work areas were defined on a university-wide basis, employees who might not be qualified for a particular position might nevertheless be considered competitive for that position for retention purposes.

We further note that appellants challenge the new rules for defining competitive work units as limited to the various offices of UDC vice presidents while failing to note that the old rules defined the units nearly identically. The old rules defined the separate work units for purposes of a RIF as follows:

(a) Grant funded individuals paid under particular grants. Each grant shall be considered as a separate and distinct work unit;

(b) Appropriated or indirect cost individuals within the offices of the President. Cooperative Extension Service employees who are paid with appropriated or non-appropriated USDA funds shall be covered in this work unit; and

(c) Appropriated or indirect cost individuals within the offices of each of the vice presidents.

8 DCMR § 1136.2 (1988). Again, though worded differently, the new rules accomplish essentially the same result. They list the office of the president, the office of the provost for academic affairs, and the offices of each of the vice presidents, i.e., academic affairs, finance, administrative services, student affairs, and institutional advancement, along with all administrative units reporting directly to those persons, and state that they all "shall be treated as separate work units for purposes of a reduction in force." 8 DCMR § 1806.3 (1992). Under this definition, McMillan's assertion that her work unit was limited to the diagnostic testing service is incorrect; her work unit was the significantly larger Office of the Vice President for Academic Affairs. Harrison, on the other hand, was the director of the Office of Veterans Affairs. Because that office was funded by a particular grant, see 34 C.F.R. § 629.1, it was considered a separate work unit under the old rules. See 8 DCMR § 1136.2(a) (1988). But there has been no change under the new rules, which likewise provide that "[p]ositions funded by a particular grant or specific contract with an outside agency or contractor shall be treated as belonging to a separate work unit." 8 DCMR § 1806.2 (1992).

Finally, appellants claim that the University's adoption of the new RIF rules in June 1992, just months before the Administrative Management Plan, Phase I, was adopted and implemented, brings the entire rule-making process into question. But appellants do not tell us what in particular is suspect about the newly adopted rules or how their status under the Plan, as compared with their status under the old rules, was affected. Nor have they offered any evidence that the rules were, or even might have been, adopted to preselect them for termination. The trial judge recognized that this particular claim of impropriety was without merit: "Even if there were evidence that the University enacted the RIF rules with full knowledge that it planned to use them soon after passage, the petitioners present no legal

authority suggesting that this would invalidate the rules." *Harmon v. Board of Trustees, supra,* mem. op. at 7. As Judge Burgess surmised in his opinion, it may well have been that UDC, knowing that a RIF might be imminent because of the University's uncertain financial situation, amended the RIF rules to bring them into compliance with our decision in *Davis,* 603 A.2d at 852–853, in which we held that educational service employees of UDC had no right to appeal to the Office of Employee Appeals. *See Harmon,* mem. op. at 7 n.1. Specifically with regard to appellant McMillan, the rules were adopted more than three years before her position was abolished, making her pre-selection claim essentially untenable.

### C. *Harrison's Individual Claim*

■ On his own behalf, Harrison also contends that the elimination of the Office of Veterans Affairs and his position as director of that office violated a federal regulation, 34 C.F.R. § 629.5. According to Harrison, the University received $576,436 from the federal government under the Veterans Education Outreach Program ("VEOP"). He maintains that section 629.5, which governs grants awarded under VEOP, requires UDC to use that money to maintain a separate veterans affairs office. This argument is entirely without merit.

Even assuming that Harrison has standing to assert this claim in this litigation,[7] nothing in section 629.5 requires UDC to establish and maintain a separate Office of Veterans Affairs. In pertinent part, the regulation provides that "a grantee may use VEOP funds only for the following activities: (1) Maintaining an office of veterans' affairs which has the responsibility for veterans' outreach, recruitment, special education programs, and the provision of

educational, vocational, and personal counseling to veterans."[8] The money must be used to maintain "an office" which carries out the functions listed in the regulation, but there is nothing which says that it must necessarily be a *separate* office. Nor is there any language in 34 C.F.R. § 629.30 that imposes such an obligation. The latter section simply requires a grantee to use "[a]t least 90 percent of the amount it receives under this part, or the amount of funds needed to carry out the activities described in § 629.5(a)(1), whichever is greater, to carry out those activities." We read this language as saying that ninety percent of the money can be used either to maintain a separate office or to perform the duties prescribed by the regulation in an office with other responsibilities.

We therefore conclude that Harrison's insistence that the University maintain a separate Office of Veterans Affairs is without any legal foundation.

### D. *McMillan's Individual Claim*

■ McMillan claims that the elimination of her position and the diagnostic testing unit interferes with the statutory mandate and mission of the University as an open enrollment institution. The thrust of her argument is that, without the testing unit, students cannot be properly placed, and that as a result the open enrollment policy is frustrated. McMillan fails to recognize, however, that the RIF did not necessarily discontinue the tasks of administrative offices at the University simply because it abolished those offices or merged them into other administrative units. The services provided by many of those offices that were abolished were either transferred or reassigned to the surviving offices. Thus the scheduling and

---

7. Any claim that UDC was inappropriately using money awarded under a VEOP grant would more appropriately be addressed, in the first instance, to the federal government, which had responsibility for administering the funds. The federal government could then

choose whether to withdraw the grant or take other action against UDC.

8. The regulation also lists five other permissible activities for which funds can be used, none of which has any bearing on this case.

proctoring of the standardized tests was not terminated simply because the testing unit, and with it McMillan's position, were abolished. While a centralized testing center may (or may not) be the best administrative unit for screening incoming students, it is surely not the only possible unit. On questions like this "[w]e refrain from substituting our judgment 'in areas of expertise reserved for the agency.'" *District of Columbia v. Davis,* 685 A.2d 389, 393 (D.C.1996) (citation omitted).

### III

In short, we find nothing improper or illegal in UDC's new RIF rules or in their implementation. Appellants have presented no evidence showing that UDC abused its discretion or committed any legal error, either when it adopted those rules or when it put them into effect. *See* D.C.Code § 1–1510(a)(3); *KOH Systems,* 683 A.2d at 449. We appreciate that appellants are employees of long standing and that the loss of their jobs may inflict hardship on them and their families. Our understanding of their plight, however, does not alter the fact that UDC was acting within its statutory powers and that appellants' legal contentions are without merit. The judgments in both cases are accordingly

*Affirmed.*