**EAGLE MAINTENANCE SERVICES, INC., Appellant**

v.

**DISTRICT OF COLUMBIA CONTRACT APPEALS BOARD, Appellee.**

**No. 03–CV–1567.**

District of Columbia Court of Appeals.

Argued Feb. 23, 2005.

Decided March 2, 2006.

---

Bonnie K. Arthur, with whom David F. Geneson was on the brief, for appellant.

James C. McKay, Jr., Senior Assistant Attorney General for the District of Columbia, with whom Robert J. Spagnoletti, Attorney General, and Edward E. Schwab, Deputy Attorney General, were on the brief, for appellee.

Before FARRELL, Associate Judge, and KERN and TERRY, Senior Judges.[*]

TERRY, Senior Judge:

Eagle Maintenance Services, Inc. ("Eagle"), appeals from an order of the Superior Court denying review of a decision by the District of Columbia Contract Appeals Board ("CAB").[1] The CAB had ruled that the District of Columbia overpaid Eagle by $959,963 under a recycling contract between Eagle and the Department of Public Works ("DPW")[2] which had been declared void *ab initio* under D.C.Code § 2–302.05(d)(1) (2001) (formerly codified as D.C.Code § 1–1182.5(d)(1) (1999)).[3] We affirm the trial court's order in part, reverse that order in part, and remand the case for further proceedings before the CAB.

---

[*] Judge Terry was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on February 1, 2006.

1. As the District points out in its brief:

 Technically, this is an appeal under D.C.Code § 11–721(a)(1) (2001) from [a] decision of the Superior Court, which had initial jurisdiction because the case, an appeal involving a bid protest, is not a "contested case" within the meaning of the D.C. Administrative Procedure Act, D.C.Code § 2–502(8) (2001). However, when reviewing the decision of the Superior Court in an agency-review case, this court essentially undertakes a *de novo* review of the decision of the agency, applying an identical scope of review. Thus, as a practical matter, it is the decision of the CAB that this court reviews.

2. Between 1992 and 1995, Eagle submitted invoices and received payments from the District totaling $2,070,056. In 1996 the District paid Eagle an additional $1,071,966, which brought the total payment amount to $3,142,022. The CAB determined that Eagle's "costs actually incurred" added up to only $2,182,059. The difference between those two figures is $959,963.

3. D.C.Code § 2–302.05(d)(1) (2001) provides:

 [With an exception not pertinent here], a contract which is entered into in violation of this chapter or the rules and regulations issued pursuant to this chapter is void, unless it is determined in a proceeding pursuant to this chapter or subsequent judicial review that good faith has been shown by all parties, and there has been substantial compliance with the provisions of this chapter and the rules and regulations.

## I. FACTUAL BACKGROUND

### A. *The Contract and the CAB Proceedings*

On February 1, 1993, Eagle entered into a contract with DPW to receive, process, and market recyclable materials collected by the District. The contract required Eagle to "have a fully operational processing facility within the District" by the first day of the second year of the contract,[4] and included a "bilateral modification" stating that the District recycling facility would be "the sole responsibility of the contractor." Eagle began its performance of the contract on March 22, 1993. In June 1993 Recycling Solutions, Inc. ("RSI"), filed a bid protest with the CAB, challenging DPW's decision to award the contract to Eagle. On April 15, 1994, the CAB sustained RSI's protest and declared the contract between Eagle and DPW void *ab initio* pursuant to D.C.Code § 2–302.05(d)(1), *supra* note 3.[5] *See Recycling Solutions, Inc.,* CAB No. P–337, 42 D.C. Register 4550 (August 18, 1995). The CAB determined that the contract award was arbitrary and did not meet other requirements of a procurement contract.[6] Accordingly, the CAB ordered DPW to cancel the contract on that ground. Instead, however, DPW sent a letter to Eagle on April 24, 1995, purporting to cancel the contract on the ground that DPW had insufficient funding to continue performance (*i.e.,* a "termination for convenience"), pursuant to the contract's Article 6. On April 28, 1995, upon receipt of this letter, Eagle submitted a demand to DPW for a termination payment of $6,644,777.05.[7] Eagle continued its recycling work for the District until approximately April 30, 1995.

The CAB later learned that DPW had violated its order of April 15, 1994, by canceling the contract for "insufficient funds." On June 6, 1995, the CAB again ordered DPW to inform Eagle that the contract had been declared void *ab initio* and was therefore canceled for that reason.[8] The CAB also stated that Eagle was entitled to actual costs reasonably incurred, but not profit, under D.C.Code

---

**4.** This requirement was not met. Eagle's interim facility in nearby Capitol Heights, Maryland, was too small to process 100 percent of the recyclables delivered by the District, so Eagle contracted with Consolidated Waste Industries ("CWI") to process what it could not handle. Eagle continued to use the CWI facility and services for the duration of its contract with the District and, according to the CAB and the trial court, performed other recycling contracts at its interim facility in Maryland as well. Eagle disputes that it performed significant recycling work for parties other than the District.

**5.** As of April 15, 1994, the date of the CAB's ruling, Eagle had not begun construction of its District of Columbia facility. Eagle finally purchased a site for it on January 14, 1995, and notified DPW on February 6, 1995, that it had done so. Eagle eventually completed construction of the facility and used it to process recyclables for the District under subsequent "emergency" contracts.

**6.** DPW appealed from the CAB's decision. The Superior Court dismissed the appeal, and this court affirmed that dismissal. *Francis v. Recycling Solutions, Inc.,* 695 A.2d 63 (D.C. 1997).

**7.** Eagle subsequently increased its demand to $6,710,757.22. It also submitted claimed costs to the District's auditors in the Office of the Inspector General totaling $4,331,706, plus an additional $5,548,367 for acquisition and construction of the District-based recycling facility.

**8.** DPW finally complied with the CAB's order on June 15, 1995, when it sent a letter to Eagle directing Eagle to cease "all designs and construction related activities" and warning that "[a]ny continued work by Eagle, including construction of the processing facility or the buy-back center, will be considered as being performed for Eagle's own benefit and at Eagle's own risk."

§ 2–302.05(d)(2).[9] The CAB then directed DPW to make a determination under the statute of the appropriate compensation for costs actually incurred by Eagle.

Between the signing of the contract in February 1993 and the termination of the contract at the end of April 1995, Eagle submitted invoices for payments and received payments from DPW in the amount of $2,070,056. DPW did not, as the CAB had directed it to do, make a statutory determination of Eagle's costs. It did, however, award Eagle an "emergency" contract for recycling services in June of 1995, under which Eagle performed essentially the same functions as it had under the 1993 contract.[10]

On January 2, 1996, DPW sent Eagle a check for $1,071,966 in an apparent attempt to settle the matter, although it still had not made the required determination under D.C.Code § 2–302.05(d)(2) with respect to compensation for Eagle's performance costs. Thus, as of January 1996, the District had paid Eagle a total of $3,142,022.[11] In March 1996 the CAB asked Eagle and DPW to prepare and submit detailed schedules of Eagle's actual costs and revenue associated with its recycling work. The Office of the Corporation Counsel (now known as the Office of the Attorney General) then requested the Office of the Inspector General ("OIG") to

conduct an audit of Eagle's costs and revenue.

The OIG completed its initial audit on August 10, 1996, and the CAB reviewed it with the parties on September 17, 1996. The following day, the CAB ordered Eagle to produce additional documentation to support findings of allowability and allocability of claimed costs,[12] and directed the OIG to prepare a supplemental audit report based on this additional information. After several more CAB orders directing Eagle to produce documentation and other information, Eagle provided the requested material on December 18, 1996. The OIG issued its final audit report on March 5, 1997, concluding that, because Eagle's actual costs were $3,688,075 and the District made $3,142,022 in payments, the District owed Eagle an additional $546,053. The CAB then held a series of evidentiary hearings in March, April, and May 1997 and requested yet more documentation from Eagle.

### B. *The CAB Decision*

In its final decision, issued on December 29, 2000, the CAB concluded that, while Eagle had entered into the contract in good faith and had not contributed to the violations, the costs actually incurred[13] by Eagle in performing the contract were $2,182,059, and that Eagle therefore owed

---

9. D.C.Code § 2–302.05(d)(2) provides:

> If a contract is void, a contractor who has entered into the contract in good faith, without directly contributing to a violation and without knowledge of any violation of the chapter or rules and regulations prior to the awarding of the contract, shall be compensated for *costs actually incurred.*
> [Emphasis added.]

10. DPW extended the emergency contract for another 120 days, and later awarded Eagle a new contract to provide recycling services through January 31, 1997.

11. This figure comes from the $1,071,966 "settlement" check plus the $2,070,056 the District paid Eagle pursuant to invoices under the contract from 1992 to 1995. See note 2, *supra.*

12. Eagle claimed total costs of $9,494,907.

13. The CAB ruled that, under D.C.Code § 2–302.05(d)(2), "costs actually incurred" are those which are "properly allocable to the work, are reasonably incurred, and are allowable under the applicable cost principles." Stated more concisely, "actual costs must be reasonable costs."

the District $959,963 for payment in excess of those costs. In arriving at that figure, the CAB analyzed each of Eagle's claims for costs, including direct labor costs, fringe benefit costs, other direct costs, subcontractor costs, general and administrative costs, and District-based processing facility costs.

Most significantly for purposes of this appeal, the CAB found, on the basis of hearing testimony and documentary evidence, that at least five percent of Eagle's costs were attributable not to work performed under the contract with the District, but to Eagle's other janitorial and recycling jobs. It therefore applied a five percent reduction to the costs claimed by Eagle in connection with its recycling operations, including direct labor costs, fringe benefit costs, other direct costs, and subcontractor costs. It also disallowed ten percent of Eagle's costs associated with "fuel, maintenance and transportation" because it found that Eagle had operated inefficiently in conducting hauling operations between its own Capitol Heights facility and the CWI facility to process recyclables from the District. Finally, it rejected Eagle's claim for $5,548,367 associated with constructing the new District-based facility. This decision was based on (1) the contract's bilateral modification, which stated that the facility would be Eagle's "sole responsibility"; [14] (2) the fact that the facility retained commercial value even after the District recycling job had ended; and (3) the fact that, because the facility was not completed before the contract was declared void, it did not benefit the District.

### C. *Proceedings in the Superior Court*

Eagle petitioned the Superior Court for review of the CAB's decision. After extensive pleadings and other documents were filed, the court affirmed the CAB's rulings and denied Eagle's petition.

The court agreed with the CAB that "actual costs" under section 2–302.05(d)(2) must be reasonable costs.[15] It therefore held that the CAB did not err when it refused to award Eagle start-up and construction costs for the District facility because the facility was not completed when the contract was declared void *ab initio* in April of 1995, so that no benefit was ever conferred upon the District which would make those costs recoverable. The court also ruled that the contract's bilateral modification precluded recovery of those costs because it established that the facility was Eagle's "sole responsibility." It concluded that the facility retained commercial value after the cancellation of the contract and that Eagle therefore obtained a benefit from its construction. Finally, the court held that the CAB's factual determinations regarding Eagle's other costs, including the five and ten percent reductions, were supported by substantial evidence. Eagle filed a timely notice of appeal.

## II. "COSTS ACTUALLY INCURRED"

We must decide whether the CAB's determinations of the "costs actually in-

14. This appears to have been the CAB's principal reason for disallowing start-up and construction costs. In support of its decision, the CAB said, "The OIG disallowed all of the claimed facility costs *principally on the basis that* the bilateral modification made clear that the facility was Eagle's private facility and its sole responsibility" (emphasis added).

15. The court rejected Eagle's argument that it was entitled to costs under the "termination for convenience" clause of the contract, ruling that the clause did not apply because the contract was declared void *ab initio* and was therefore subject to the provisions of D.C.Code § 2–302.05.

curred" by Eagle under the void contract with DPW were based on substantial evidence in the record, and whether the CAB erred in holding that the District was entitled to a refund of its excess payment. For the most part, we affirm the trial court's decision, but in two respects we must reverse and remand for further proceedings.

■ We review the CAB's factual findings deferentially. As this court said in *Belcon, Inc. v. District of Columbia Water and Sewer Authority,* 826 A.2d 380, 384 (D.C.2003):

The Board's factual findings "shall be final and conclusive and shall not be set aside unless the decision is fraudulent, arbitrary, capricious, or so grossly erroneous as to necessarily imply bad faith, *or if the decision is not supported by substantial evidence.*" D.C.Code § 2–309.07 (2001) (emphasis added). Evidence is substantial when "a reasonable mind might accept [it] as adequate to support a conclusion." *Epstein, Becker & Green v. District of Columbia Dep't of Employment Services,* 812 A.2d 901, 903 (D.C.2002). So long as a finding is supported by substantial evidence, we must accept it, "even though there may also be substantial evidence in the record to support a contrary finding." *Harrison v. University of the District of Columbia,* 758 A.2d 19, 22 (D.C.2000).

Our review of the CAB's conclusions of law, however, is guided by a somewhat different standard:

[W]hile "as to questions of law ... [the Board's] decision is not final or conclusive ... nonetheless, we give careful consideration and great respect to [its] interpretation because legal interpretations by tribunals having expertise are helpful even if not compelling." ... This deference is especially proper in cases such as this involving mixed questions of fact and law where the Board— and [this court] on review—must examine a detailed record of the parties' course of dealing and performance.

*Dano Resource Recovery, Inc. v. District of Columbia,* 620 A.2d 1346, 1352 (D.C. 1993) (citations omitted).

■ Eagle seeks compensation under D.C.Code § 2–302.05(d)(2), which provides that "[if] a contract is void, a contractor who has entered into the contract in good faith [and is not otherwise disqualified] shall be compensated for *costs actually incurred* " (emphasis added). It is important to emphasize here that the CAB determined, and the trial court agreed, that under this statute "costs actually incurred" are those which are "properly allocable to the work, are reasonably incurred, and are allowable under the applicable cost principles." In other words, the CAB said, "actual costs must be reasonable costs." This formulation is consistent with *Abadie v. Organization for Environmental Growth, Inc.,* 806 A.2d 1225 (D.C.2002), in which we held that "termination costs are allowed only if they are reasonable, allocable to the contract, consistent with cost accounting standards and generally acceptable accounting principles and practices, and consistent with any limitations in the contract or regulations with respect to the type or amounts of costs." *Id.* at 1227 (footnote omitted). "A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business.... *No presumption of reasonableness shall be attached to the incurrence of costs by a contractor.... [T]he burden of proof shall be upon the contractor to establish that such cost is reasonable.*" *Id.* at 1228 (citation omitted; emphasis added in *Abadie* ). Any findings relating to the reasonableness of those costs must be sup-

ported by substantial evidence. *Id.* at 1227.

## III. THE DISTRICT–BASED FACILITY

### A. *The Bilateral Modification*

■ Eagle argues that the CAB and the trial court erred when they concluded, as a matter of law, that the bilateral modification of the contract precluded Eagle from recovering start-up costs because, under that modification, Eagle was "solely responsible" for the facility. On this point we agree with Eagle.

The bilateral modification states:

The contractor is responsible for obtaining all permits necessary to establish the recycling processing and buy back facilities in the District. By executing this contract the District does not waive any requirements of law or the right to review permit application in accordance with applicable criteria. *The processing and buy-back facilities are private facilities which are the sole responsibility of the contractor.* [Emphasis added.]

The CAB ruled that the italicized sentence meant that Eagle had "no legitimate expectation of recovering costs of the District-based facility." The trial court agreed, stating: "The plain meaning of the modification clearly establishes the District Facility as the sole responsibility of Eagle. This includes, *inter alia*, start-up and construction costs associated with the ... Facility."

We do not read this language so broadly. Although we would normally defer to the expertise of the CAB, *see Dano Resource Recovery*, 620 A.2d at 1352, in this instance we think the CAB's conclusion that Eagle essentially waived its statutory right to recover costs it reasonably incurred is an incorrect reading of the bilateral modification. Surely, a waiver of such

magnitude must be clear and unambiguous. Had the parties actually intended to place sole financial responsibility on Eagle for construction of the District facility, the bilateral modification could have—and should have—declared that intention in plain, unambiguous language. *See, e.g., Keller v. Keller*, 171 A.2d 511, 514 (D.C. 1961) ("If the parties intended a waiver ... in all circumstances, it was an easy matter for them to state such intention"). It did not do so, however, and for this reason we hold that the CAB's interpretation of the bilateral modification stretches its meaning too far. The "sole responsibility" language of the bilateral modification is too vague and imprecise to be construed as a deliberate waiver of Eagle's statutory right to recover its "costs actually incurred." Thus, standing alone, the bilateral modification does not preclude Eagle from recovering its start-up costs.

Eagle's argument that the start-up costs were incurred pursuant to the contract is, however, without merit. All construction costs associated with the District-based facility were incurred *after* the contract was declared void. This case is therefore distinguishable from *New York Mail & Newspaper Transportation Co. v. United States*, 139 Ct.Cl. 751, 154 F.Supp. 271, *cert. denied*, 355 U.S. 904, 78 S.Ct. 332, 2 L.Ed.2d 260 (1957), upon which Eagle primarily relies. In that case a contract was declared invalid three years after performance began. The court held that "[w]hen an individual or the Government rescinds a contract, the parties are to be placed, as far as possible, in the position they would have occupied without the transaction." *Id.* at 759, 154 F.Supp. 271, 154 F.Supp. at 276 (footnote omitted). The contractor was therefore awarded costs that it had incurred during its performance of the contract.

The difference between *New York Mail* and this case is that, in *New York Mail,* the contractor began performance *before* the contract was terminated. Consequently, "since the [cost incurred by the plaintiff] was due solely to the requirements of the contract, the Government should reimburse that expense in accordance with the terms of the contract ...." *Id.* at 759–760, 154 F.Supp. at 276. In the instant case, however, Eagle did not even acquire the site for the facility until January of 1995, nine months after the CAB declared the contract void (see note 5, *supra* ). Thus it was not "due solely to the requirements of the contract" that Eagle incurred its start-up costs. On the contrary, the contract was no longer valid when Eagle began its construction of the facility, and *New York Mail* does not support its argument.

This is not to say that Eagle is necessarily foreclosed from recovering *any* of its start-up costs. As we have said, the bilateral modification cannot be read as a waiver of Eagle's statutory right to recover "costs reasonably incurred." Indeed, it may well be that some of the costs Eagle incurred in building the facility were reasonable, since it might not have purchased the site and begun construction had DPW initially followed the CAB's instructions and informed Eagle that the contract had been declared void *ab initio.* We leave it to the CAB on remand to determine what specific start-up costs, if any, were "reasonably incurred."

### B. *No Benefit to the District*

■ Eagle also contends that the CAB and the trial court erred when they applied the theory of *quantum meruit* in determining whether Eagle was entitled to recover start-up costs for construction of its District-based facility. Instead, according to Eagle, it "was entitled to be compensated for all of its facility start-up and construction costs under the contract's termination-for-convenience-of-the-government clause" because it was an "innocent contractor."

The most obvious flaw in this argument is Eagle's insistence that it is entitled to recovery under the contract's termination-for-convenience clause. It is undisputed that the CAB declared the contract void *ab initio* in April of 1995. It therefore makes no difference that Eagle did not act in bad faith and had no knowledge that the procedures the District followed in procuring the contract were improper (*i.e.,* that Eagle was an "innocent contractor"). D.C.Code § 2–302.05(d)(2) specifically states that, when a contract is declared void (as it was here), an innocent contractor is entitled only to "costs actually incurred," not all of its costs as Eagle is now claiming. Thus Eagle's potential recovery is based on this statutory provision, not on the termination-for-convenience clause of the contract.[16] The CAB's task, therefore, was to determine what costs were actually incurred, *i.e.,* Eagle's "reasonable" costs.

Eagle also errs in characterizing the CAB's decision in terms of recovery based on *quantum meruit.* It does not appear that the CAB relied on that theory in assessing whether Eagle's claimed costs for start-up and construction of the facility were reasonable, at least not explicitly, and certainly not exclusively. It merely considered the fact that the District had received no benefit from the construction of the facility—which was not begun until

---

**16.** Eagle's reliance on *John Reiner & Co. v. United States,* 163 Ct.Cl. 381, 325 F.2d 438 (Ct.Cl.1963), *cert. denied,* 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964), is therefore misplaced, because that case involved a contract that was terminated for convenience. Moreover, the court said, the contract was "lawful, not void." *Id.* at 389, 325 F.2d 438, 325 F.2d at 442.

after the contract was declared void *ab initio*—in deciding that Eagle's start-up costs were not recoverable as "costs actually incurred." [17] It also based its decision on the contract's bilateral modification and on the continued commercial viability of the facility even after the contract was determined void (although, as we have held, its decision with regard to the scope of the bilateral modification was erroneous).

■ The CAB's conclusion that construction costs incurred after the contract was declared void were not "reasonable" under section 2–302.05(d)(2) is supported by substantial evidence (though the CAB's explanation leaves something to be desired, since it merely stated that it agreed with the OIG's analysis that the start-up costs never benefited the District recycling program). As we said earlier, evidence is substantial when "a reasonable mind might accept [it] as adequate to support a conclusion." *Belcon,* 826 A.2d at 384 (quoting *Epstein,* 812 A.2d at 903). This court must therefore accept the finding even though "there may also be substantial evidence in the record to support a contrary finding." *Id.* (quoting *Harrison,* 758 A.2d at 22).

The record reveals that, as of the date the contract was declared void *ab initio,* Eagle had not even begun construction on its District-based facility. Eagle's contention that it was "faced with a Hobson's choice when RSI filed its protest: either stop performance and risk a lawsuit from the District for material breach of contract, or perform until the Superior Court decided the matter and risk receiving nothing under the CAB's *quantum meruit* approach" is therefore without merit. If Eagle had actually begun construction during the performance period, the CAB might well have concluded that the costs associated with construction were "reasonable." But because the facility did not even exist at the time the contract was declared void, the costs associated with its construction cannot be regarded as actual costs of performance. On the other hand, Eagle might not have purchased the site at all and begun construction if it had not relied on DPW's actions. If the CAB finds that such reliance was reasonable, then Eagle may be entitled at least to recover some or all of its site-acquisition costs, and (as we said earlier) perhaps even some of its start-up costs. This, of course, is for the CAB to decide in the first instance on remand, after hearing such evidence as Eagle may choose to present.

### C. *Commercial Value*

■ Eagle also maintains that "[t]he conclusion that Eagle's costs represented

---

**17.** The trial court upheld this finding, apparently relying on *United States v. Amdahl Corp.,* 786 F.2d 387, 393 (Fed.Cir.1986). In *Amdahl* the court held that when a contract is declared void *ab initio,* the "innocent" contractor may recover the value of benefits conferred to the government in the form of goods and services under the theory of *quantum meruit.* Exclusive reliance on that case's *quantum meruit* analysis would be in error because, as the CAB explained in *Prince Construction Co.,* CAB No. P–530, 45 D.C. Register 8784 (December 4, 1998):

> Section [2–302.05](d)(2) goes beyond the federal quasi-contractual approach by not limiting an innocent contractor's recovery to quantum meruit based on a benefit conferred on the government. *The section authorizes the innocent contractor to recover its actual costs of performance even if the government has received little or no benefit.* [Emphasis added.]

But neither the CAB nor the trial court relied exclusively on the fact that no benefit was conferred on the District in determining that Eagle was not entitled to start-up costs. That was merely one of several factors leading to the conclusion that the District should not bear the costs of construction.

capital improvements that had commercial value to Eagle was not supported by substantial evidence." We must agree, for the record is silent as to how the OIG, and thereafter the CAB, concluded that the District-based facility was commercially valuable to Eagle.

The CAB found that "Eagle was using the facility after the end of the District recycling job for commercial purposes and that the facility had a commercial value." It also determined that "Eagle used the facility for a follow-on recycling contract awarded by the District to Eagle." The CAB appears to have based this determination largely on the audit conducted by the OIG. The OIG's report stated:

> We observed during our field work, between June 13, 1996, and July 12, 1996 ... [that] the contractor was using the facility for commercial purposes. Hence, in our opinion, it is not impracticable for the contractor to put the facility to commercial uses. In addition, we believe that the facility has significant economic value in the recycling marketplace .... We also understand that Eagle, under a current contract for recycling with DPW, is using the facility.[18]

No further details are provided. The CAB's decision contains a similarly opaque and conclusory determination that "the costs represent capital improvements that have a commercial value to Eagle." Nowhere does the CAB explain why this is

the case. The cost and revenue schedules contained in the OIG's report appear to cover the years 1993 to 1995 (the term of the contract), but that was before the District-based facility was built.[19]

■ If there is supporting documentation for the CAB's conclusion that the facility had commercial value, it is not this court's responsibility to find it. "We do not ourselves scour the record in search of evidence or rely on evidence other than what the Board itself relied on to support its findings." *Abadie*, 806 A.2d at 1229. Because the Board relied on the OIG's audit report, and because that report appears to provide no support for its conclusions, we cannot ascertain where the conclusion that the facility had commercial value came from. The substantial evidence test is satisfied only when an administrative agency "fully and clearly explains its decision and demonstrates 'a rational connection between the facts found and the choice made.'" *Office of People's Counsel v. Public Service Comm'n*, 797 A.2d 719, 726 (D.C.2002) (citation omitted). Since we cannot discern from the record the CAB's reason for concluding that the facility had commercial value, we must remand the case to the CAB for further proceedings on this issue as well.

## IV. OTHER COSTS

Eagle next contends that the CAB arbitrarily reduced or disallowed its other

---

18. Eagle argues that the only work being done at the facility was on the District's behalf. As the District correctly observes, however, "the point is that the facility was not used *for the contract in question,* which Eagle ceased performing on April 30, 1995" (emphasis added). Thus any recycling jobs performed on behalf of the District under the emergency contracts are irrelevant to the determination of costs actually incurred as a result of the void contract.

19. Moreover, Eagle's contention that "the OIG based its 'commercial value' analysis on the impracticability language of ... the contract's voided cancellation clause" is unfounded. Though the OIG obviously considered the practicability of continued use of the District-based facility, it also considered other factors, such as the economic value of the facility and the projects actually being performed there, in order to make an overall determination of the costs actually incurred by Eagle (which was the stated objective of the audit).

costs, including direct labor costs and general administrative costs. As to these claims, we uphold the CAB.

### A. The Five Percent Reduction

■ Eagle maintains that the five percent reduction applied by the CAB to its costs was "non-contractual and arbitrary." In contrast to the CAB's decision regarding commercial value, there was ample evidence and explanation in the record to support the CAB's determination that "at least 5 percent of the recyclables processed at the interim facility . . . were generated from Eagle's other recycling and janitorial jobs from commercial haulers." The CAB explained that its conclusion was based on evidentiary hearings it conducted and documents it received. According to the CAB, the evidence showed that "Eagle continued to collect recyclables [from Prince George's County, Maryland] . . . using its own trucks and drivers"; that Eagle collected recyclables for Dow Chemical Company, the United States Public Health Service, and an entity referred to as "The Cluster"; and that it "may have been collecting materials from the Washington Design Center." Given this information, the CAB also found that the testimony of Eagle's president that only one percent of the recyclables processed at the interim facility came from non-DPW sources was "not credible."

It is clear from the CAB's detailed analysis that there was substantial evidence to support its finding that the non-DPW jobs processed at the facility exceeded one percent, and that there was a rational connection between this finding and the decision that Eagle's "costs actually incurred" ought to be reduced by five percent. *See Office of People's Counsel*, 797 A.2d at 726. Moreover, the CAB was in the best position to evaluate the credibility of witnesses, and this court must give deference to its credibility findings. *See, e.g., Wash-*

*ington Metropolitan Transit Authority v. District of Columbia Dep't of Employment Services*, 683 A.2d 470, 477 (D.C.1996).

### B. The Ten Percent Penalty

■ Likewise, the ten percent penalty imposed on certain of Eagle's claimed costs was supported by substantial evidence. The CAB relied on the OIG audit, testimony at the four evidentiary hearings, and supporting documentary evidence to conclude that some of Eagle's claimed costs should be reduced by ten percent because of Eagle's inefficient use of CWI's recycling facility, resulting from inadequacies in Eagle's own facility. This sort of detailed fact-finding is the responsibility of the CAB, and there is no reason for this court to disturb it unless it is unreasonable, which it is not. *See Belcon*, 826 A.2d at 384. Moreover, the CAB did not apply the ten percent reduction to all of Eagle's claimed costs, but undertook a thorough and careful examination of the record concerning Eagle's hauling and recycling operations. We find no error in the imposition of the ten percent penalty.

### C. Direct Costs and General and Administrative Costs

Eagle's claims concerning direct costs and general and administrative costs are similarly without merit. Again, it is clear from the CAB's extensive explanations regarding each claimed cost that it based its decision on substantial evidence in the record. The CAB had the benefit of the OIG's report, as well as several days' worth of live testimony and a plethora of documentary evidence. Moreover, the CAB carefully allocated costs based on reasonableness. For example, with regard to general and administrative ("G & A") costs, it noted:

> We could deny all Eagle G & A costs for lack of adequate support, but such a

blanket denial may be unfair since clearly there are some allowable G & A costs. We adopt another approach. Eagle proposed in its BAFO [best and final offer] a G & A rate of 11 percent on total costs. We find this rate to be reasonable even considering the problems with Eagle's G & A cost support.

This and similar statements show that the CAB was taking into account as much evidence as it could in determining Eagle's actual costs. It is also consistent with the requirement that actual costs be "reasonable, allocable to the contract ... and consistent with any limitations in the contract or regulations with respect to the type or amount of costs." *Abadie*, 806 A.2d at 1227.

### D. *Refund of Payment in Excess of Costs*

Eagle also contends, in the alternative, that the CAB erred in ruling that it owed the District $959,963 for payment in excess of its costs actually incurred. It argues that under the doctrines of voluntary payment, account stated, and accord and satisfaction, it was entitled to retain all of the $1,071,966 payment from the District. We cannot agree.

 The common law doctrines cited by Eagle afford it no relief, for they do not apply in the instant case.[20] Accord and satisfaction is an "affirmative defense [raised by a debtor] to a breach of contract claim." *Pierola v. Moschonas*, 687 A.2d 942, 947 (D.C.1997). This is not a breach of contract case; hence the concept of accord and satisfaction is irrelevant. Similarly, the voluntary payment doctrine,

aside from being "an old common law doctrine rarely cited by courts in modern, complex transactions," *Avianca, Inc. v. Corriea*, 1992 WL 93128, at *6, 1992 U.S. Dist. LEXIS 4709, at *20 (D.D.C.1992), is an affirmative defense to a suit for breach of contract which provides that "money voluntarily paid under a claim of right to the payment, and with knowledge of the facts by the person making the payment, cannot be recovered by the payor solely because the claim was illegal." *Smith v. Prime Cable of Chicago*, 276 Ill.App.3d 843, 847, 213 Ill.Dec. 304, 658 N.E.2d 1325, 1329 (1995). That doctrine is not applicable here, since Eagle is not being sued and, in any event, is not defending against a claim for costs, but is instead claiming additional costs. Moreover, as the District points out, the voluntary payment doctrine does not apply to payments by government officials which are later determined to have been *ultra vires*. *See United States v. Bentley*, 107 F.2d 382, 384 (2d Cir.1939); *Heidt v. United States*, 56 F.2d 559, 560 (5th Cir.), *cert. denied*, 287 U.S. 601, 53 S.Ct. 8, 77 L.Ed. 523 (1932).

 The doctrine of "account stated" is likewise inapplicable. An account stated is "a promise by a debtor to pay a stated sum of money which the parties had agreed upon as the amount due ...." *Ally & Gargano, Inc. v. Comprehensive Accounting Corp.*, 615 F.Supp. 426, 428–429 (S.D.N.Y.1985). The doctrine "presupposes an absolute acknowledgment or admission of a certain sum due, or an adjustment of accounts between the parties, the striking of a balance, and an assent, express or implied, to the correctness of the balance." *Falcone v. Paradiso*, 60 App.

---

20. We also reject, however, the District's contention that the Procurement Practices Act supersedes the common law theories upon which Eagle relies. This argument is not only unsupported by precedent but also contrary to section 818 of that Act, D.C.Code § 2-

308.18 (2001), which states: "The provisions of this chapter are not exclusive, *and the remedies provided for shall be in addition to any other remedies provided for in any other law or available pursuant to common law*" (emphasis added).

583

D.C. 348, 350, 54 F.2d 715, 717 (1931) (citations omitted). In this case there was certainly no "assent ... to the correctness of the balance" because, even after Eagle received the check from DPW, it sought roughly $8 million more in additional costs. Eagle never "agreed" that the amount sent by DPW was "the amount due."

 Under D.C.Code § 2–302.05(d)(2), Eagle was entitled to recover "costs actually incurred." The CAB determined that the payments made to Eagle by the District exceeded the costs Eagle actually incurred in performing the contract, and that the District was therefore entitled to recover the excess amount. This is certainly not an unreasonable interpretation of the statute, to which we owe deference. *See Belcon,* 826 A.2d at 384. Moreover, if the government overpays a party with whom it has contracted, it is almost always entitled to a refund. *See United States v. Wurts,* 303 U.S. 414, 415, 58 S.Ct. 637, 82 L.Ed. 932 (1938) ("The Government ... can recover funds which its agents have wrongfully, erroneously, or illegally paid"). The District therefore has a right to recover the balance of the payments it made to Eagle in excess of Eagle's actual costs, and the CAB did not err in so concluding.

### V

For the reasons stated, we affirm in part and reverse in part the order of the Superior Court from which this appeal is taken. The case is remanded to that court, with directions to remand it to the CAB for further proceedings consistent with this opinion.

*Affirmed in part, reversed in part, and remanded for further proceedings.*